2021 IL App (1st) 161219

FIRST DISTRICT
THIRD DIVISION
March 31, 2021

No. 1-16-1219

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 06600 |
| | ) | |
| REGINALD POTTS, | ) | Honorable |
| | ) | Thomas V. Gainer, Jr., |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Burke concurred in the judgment and opinion.

**OPINION**

¶ 1    A jury convicted defendant Reginald Potts of the first degree murder of Nailah Franklin.

Defendant alleges a vast array of errors, including the failure to suppress evidence, defective jury

instructions, ineffective assistance of counsel, rampant prosecutorial misconduct, and the trial

court's refusal to allow a witness who emerged after trial to testify on defendant's behalf without

revealing his identity to the public. We affirm.

¶ 2                                    BACKGROUND

¶ 3                                         I

¶ 4    Nailah Franklin was last seen alive on September 18, 2007, in the company of defendant.

Nailah, then 28 years old, worked as a pharmaceutical sales representative for Eli Lilly and part

time in an art gallery. By all accounts, Nailah was popular, vivacious, and attractive, with a busy

social calendar. She met defendant in May 2006. A self-described real-estate investor, defendant

presented as a wealthy man with a lavish lifestyle—a penthouse in the south loop, a Bentley and

other fancy cars, and money to frequent upscale restaurants and trendy clubs. Defendant and

Nailah saw each other regularly, but not exclusively, until July 2007, when Nailah broke it off. She recently met Andre Wright at the art gallery. Although Andre lived in Milwaukee, their relationship grew "serious" quickly. Unlike defendant, whose arrogance had worn thin with Nailah, Andre treated her with respect. But Nailah remained in touch with defendant for a time, as revelations about his past—and present—began to surface.

¶ 5    On July 16, 2007, Nailah sent defendant an e-mail titled, "Adios." As she explained, she had tried several times to "remove [defendant] from [her] life," but somehow he always managed to "slip back in there." The time had come to finally "put an end to any and all communications." Nailah was "very disappointed" that defendant treated their relationship as just one more of his "games" and sexual exploits. He was deeply disrespectful. He constantly flirted with her friends. He obsessed, to the point of being "pathological," over seemingly insignificant things. He cared only for himself and only about the money he was "so focused on making."

¶ 6    Worse yet, she wrote, "[s]ince the first day we met, you and your life has been nothing but lies." There was defendant's " 'omission' of jail time and illegal history." His "[c]onstant lies and stories" about where he was and what he was doing. The fact that he "probably" had another girlfriend the whole time. And most disturbing of all, his refusal to acknowledge the existence of his own children. As it turned out, defendant had (at least) three daughters, two with his soon-to-be ex-wife, Nathaly Figueroa, and one, an infant, with Ina Dorsey.

¶ 7    Nailah did not want to hear from defendant again. If her "impulsive side" ever led her to call, she said, "do not answer. It doesn't mean anything." It was just "a slip of the brain."

¶ 8    Two of Nailah's friends—her best friend, Dana McClellan, and her coworker Tiffani Miley—confirmed that Nailah was angry and felt disrespected by what she was learning about defendant. But her communications with defendant did not end just yet. Neither did her interest

in learning the truth about him. In the weeks to come, Nailah learned that he had been seeing Joy Hawkins—and flirting with Tiffani, who rebuffed his advances—over the summer. And she reached out to Ina. At home with defendant's infant child, and in the midst of searching for a house for the three of them, Ina was surprised to learn that her relationship with defendant was not exclusive. Nailah and Ina would continue to speak at length and share information about defendant, until Nailah disappeared.

¶ 9      On September 6, 2007, someone (it was not clear who) e-mailed Nailah an article about defendant from the Chicago Sun-Times. Nailah forwarded the article to Dana and Tiffani, and blind-copied defendant. That message has come to be known as the "FBI" e-mail. Nailah wrote, "Girl, this s*** is hilarious. Old girl just sent this to me." The text of the article followed. It said that defendant had once been arrested on "drugs and weapons charges out of Chicago" and for threatening a Highland Park police officer who was investigating him for stealing cars. While he was left alone for just a moment at the Dirksen Federal Building, "the skinny Potts" slipped out of his handcuffs and escaped. While on the lam, he called the FBI to boast that they would never catch him. Agents found him hiding under a bush two weeks later and arrested him.

¶ 10      The "FBI" e-mail set off a barrage of heated communications over the next few days. The first was a long voicemail that defendant left Nailah. He repeatedly bragged that he was "very, very wealthy" and will always be surrounded by women and finery. He accused Nailah of being "hung up" on him, "desperational," and angry that he "won't f*** with [her] anymore." He called Nailah "bitter" and "venomous," said that she did not deserve the things that he has, and told her to forget about him.

¶ 11      Defendant also responded in an e-mail. He copied Tiffani (among others), ignoring her repeated requests not to be dragged into whatever "drama" was brewing with Nailah. The subject

line read, in part, "B***, I'm rich! So that s*** doesn't even matter." Defendant commented on how "sad" it was that Nailah was "so caught up" in him and so "MADD [*sic*]" that he wouldn't take her calls or come over and "f***" her anymore. But "aw don't be upset," he said, "you give okay head and your a*** is kinda tight so you should be able to find a decent man in no time. Just do yourself a favor and get a lift for those saggy a*** breast[s]." He warned, stop "testing me" or "trying to figure out my moves or who I'm f***." And he claimed that the article did not embarrass him; it just made Nailah look "bitter and desperate." But if she kept "talking s*** and sending articles," he would respond by "passing around copy's [*sic*] of the tape that show my d*** in your mouth."

¶ 12    "A bit dramatic," Nailah wrote back, adding that defendant was "[c]learly *** crazy." She wondered how defendant got her friends' e-mail addresses and asked him not to contact Dana or Tiffani—or her—ever again. They had enough of his "obsessive calling and behavior."

¶ 13    Defendant left Nailah another voicemail. It appears the message was eventually deleted, but Nailah played it for Dana and Tiffani. As Dana recalled, defendant said, "I could erase you, and I should have somebody come over there and get you now." According to Tiffani, he said, in an "angry and very serious" tone, "if you do anything else, if I hear anything else, I will erase your a***. You will disappear." Nailah said she wanted Tiffani to hear the message "just in case anything happened to her."

¶ 14    Defendant called Nailah again, and she put Dana on hold to take his call. When she got back on the line with Dana, she was scared. She gave Dana the access information for her e-mail and voicemail, "in case anything happened to her." Over the next few days, Nailah and Dana would text and talk frequently about defendant, as Nailah became increasingly frightened.

¶ 15    Meanwhile, Ina confronted defendant about what she was learning from Nailah. He grew

angry and insisted that Nailah was lying. He also became violent with Ina. (We will discuss this violence in more detail *infra* ¶¶ 61-74.)

¶ 16    Nailah e-mailed defendant to say that she filed a police report and would seek an order of protection. She told him, "If you come anywhere near me you will be back in jail, I promise. You are crazy, you hit women, you are a bully, you are extremely dangerous, but you are not going to bully me."

¶ 17    Communications between Nailah and defendant petered out around September 11. Nailah spent a few days with Andre in Wisconsin. When she came back, she told Tiffani that she was afraid of defendant and wanted to get a restraining order against him. And she e-mailed Ina, who was seeking a similar order, suggesting that they share information. That same day, she told her friend Devin Carter that defendant threatened to kill her. Nailah said, ominously, "[i]f something happened to her, that he did it."

¶ 18                                          II

¶ 19    That was September 17, 2007. By the latter part of September 18, Nailah was missing.

¶ 20    Nailah traded e-mails with Andre throughout the morning, and she called in to work, not long before noon, to take a personal day. But after that, calls, e-mails, and texts to Nailah started to go unanswered. Neither Andre nor her supervisor at Eli Lilly could get a hold of her, which was unusual; Nailah and Andre spoke constantly, and Nailah was always dependable at work.

¶ 21    Between roughly 4 p.m. and 9:30 p.m., suspicious messages starting coming from Nailah's phone. Andre, Devin, and her sister, Ashley, received cryptic texts that sounded nothing like Nailah. Her coworkers received messages that made no sense; they purported to say that Nailah was working in places where she demonstrably was not. A man called from Nailah's phone to make a dinner reservation under the name "Franklin" (the employee could not make out

the first name due to background noise on the call) for later that evening but never showed up. Brent Demar, an ex-boyfriend, got a string of messages, "completely out of left field," that did not sound like Nailah either. Around 7:30 that evening, he got a call from Nailah's phone. The caller said, "hello, can you hear me? Can you hear me?" It sounded like Nailah's voice, he thought, but there was too much "air" noise to be sure, and the call disconnected after a few seconds. Another call came in and immediately disconnected. He called back, but the call went to voicemail.

¶ 22    Around 10:15 p.m., several 911 calls were placed from Nailah's phone. There were no voices on the calls, but there was noise and music in the background. The caller was in the south loop, close to 1111 S. Wabash Avenue—defendant's condo building. The police looked for Nailah's car in that area but did not find it. Starting at 11:05 p.m., all incoming calls to Nailah's phone went directly to voicemail and no outgoing calls were placed.

¶ 23    At trial, the State argued that defendant sent these suspicious messages to make it seem as if Nailah was still alive, right up until the time that he could make himself seen in public. Around 10:30 p.m., he met up with Joy, as she was leaving a bar in the Gold Coast.

¶ 24    On September 19, Dana (and others) went to Nailah's condo to look for her. Her unit was locked, which was unusual, but Dana had access to a spare key. The condo was in disarray, and Nailah's laptops and iPod were missing. Her car was not parked in her usual space in the garage.

¶ 25    Dana accessed Nailah's voicemail. The threatening message Nailah played for her had been deleted, but a different, innocuous sounding message left by defendant was still there. Dana reported Nailah missing, and the media picked up the story.

¶ 26                                        III

¶ 27    That day, a pedestrian found a box of Eli Lilly Cymbalta in an alley near defendant's

condo building. (Nailah routinely carried samples of Cymbalta. Like all samples, it was highly regulated and required a strict accounting.) It seemed "very out of place" since there were no medical offices nearby. After hearing a news report about Nailah, the pedestrian called the police, but the box had been moved by then.

¶ 28     And Officer Lucius found six boxes of Eli Lilly samples, addressed to Nailah at a storage facility she used in Chicago, stacked in the River Oaks Golf Course parking lot, just off of River Oaks Drive in Calumet City. Also on River Oaks Drive, close to the golf course, was a shuttered Video Max store owned by defendant's brother-in-law, Mahmoud El-Sheikh. Defendant had taken Ina to the property shortly after Mahmoud bought it.

¶ 29     Two days later, the police obtained Nailah's cellphone records, including historical cell-site location information, pursuant to an "Exigent Situation" request. The records showed that Nailah's phone used towers in Hammond and Calumet City. Although Nailah's sales territory included points south in the Chicago area, her partner, Molly Zeigler, testified that Calumet City was not part of Nailah's route.

¶ 30     Later that day, the police found Nailah's car in a residential neighborhood in Hammond, a few blocks from the Calumet City border, and about three miles from where the pharmaceutical boxes were found. Among other items in the trunk, which was in disarray, the police found two Remy Martin advertisement cards. Kimberly Nash, another woman defendant was seeing at the time, and who frequently spent the night at his condo, was a marketing manager for Remy Cointreau USA, the American distributor of Remy Martin liquors.

¶ 31     The police found fibers in various locations, suggesting that the car had been wiped down with a cloth or a piece of clothing, and there were unusually few latent prints in the cabin. There were blood stains on some paperwork and one of the samples. No forensic evidence tied

defendant, or anyone else, to Nailah's murder.

¶ 32    The police searched for Nailah's body in and around the golf course, including a nearby pond and forest preserve. They found some jewelry and another Remy Martin card, like the ones in Nailah's trunk, between the pond and golf course parking lot, near an Outback Steakhouse.

¶ 33    Also adjacent to the preserve was the parking lot of the Video Max owned by defendant's brother-in-law. On September 27, Nailah's body was found about 20 feet from the edge of that lot, along a path connecting the lot and the preserve—and directly between the pharmaceutical boxes (in the golf course parking lot) and Nailah's car (in a residential area about a half mile away). Nailah's body was nude, partially buried, and decomposing. Her identity was confirmed through dental records.

¶ 34    Dr. Crowns, the pathologist who performed Nailah's autopsy, testified in detail about his findings. Many areas of Nailah's body were partially mummified and skeletonized and infested with maggots. He estimated that she had died 8 to 12 days earlier, meaning sometime between September 16 and 20. Based on the final disposition of her body—naked and buried in a shallow grave—her death was ruled a homicide. And based on the lack of observable injury, Dr. Crowns opined that the cause of death was asphyxiation, which can be caused in a variety of ways, including strangulation, smothering, choking, and some methods—like covering the victim's nose and mouth with a plastic bag or placing the bag over the victim's head—that typically do not leave any observable evidence of injury.

¶ 35                                    IV

¶ 36    In the days leading up to Nailah's disappearance, neighbors and security guards in her building saw defendant lurking there in suspicious contexts. At trial, the State argued that he was plotting Nailah's murder.

¶ 37 On the morning of September 16, Sterling Gunn saw defendant sitting in his Bentley in the parking garage, with the garage door left open. That door was typically closed. Defendant asked if he should move his car. Gunn said no and tended to his business. When he looked up again, the Bentley was gone, the garage door was still open, and defendant was peering through the door, "looking around at [him]" from the parking deck.

¶ 38 The next evening, Sheila Gregory saw defendant walking down the hallway. It did not look like he was coming out of any unit or going anywhere in particular. Security footage showed defendant walk out of the elevator and into the parking garage.

¶ 39 Lisa Hudson, a security guard, went to the parking garage after someone reported that the door would not close. She saw defendant pacing and talking on his phone. Later, Hudson and another guard returned, this time to investigate a report of a suspicious person. They found defendant in a stairwell and asked what he was doing there. He said he was smoking, but he did not have a cigarette, and the guards did not smell smoke. He also said his name was "Johnson" from Unit 403. The guards were not fooled. They called the police, and defendant drove away in his Bentley. Officers searched the garage and found that the locking mechanism for the door had been tampered with.

¶ 40 Surveillance footage from the building showed Nailah entering the garage shortly before noon on September 18 and returning with defendant. Shortly after 1 p.m., they went back to the parking garage. Nailah was walking in front of him and appears to look back at him as they enter the garage. That was the last time Nailah was confirmed to be alive.

¶ 41 Surveillance footage from defendant's building showed him entering the lobby, shortly before 5 p.m. on September 18, with a laptop. The doorman testified that it was not uncommon for defendant to bring a laptop to the building's business center, accessible from the lobby,

where residents could get free Wi-Fi access. Within the next hour, defendant was seen leaving the building twice, both times without a laptop. The doorman did not see him again until roughly 10:30 p.m., when he came into the building and went through the rear hallway, toward the elevators to the parking garage. Surveillance footage showed him driving away from the building two minutes later.

¶ 42    A few days after Nailah's body was found, the police searched defendant's apartment. Among other items, they seized Nailah's iPod. (The serial number confirmed that she was the original purchaser.) Although the device was named "Reginald," forensic analysis showed that it was originally named "Nailah's iPod." Shortly after midnight on September 19, the device was connected to iTunes, and the name was changed. A new iTunes file was created, and the old database was deleted at that time. No files had previously been registered to "Reginald."

¶ 43                                          V

¶ 44    Two days after Nailah went missing, defendant agreed to be interviewed by the police. Defendant was aware that Nailah was missing, but he denied any involvement. He said that they had a purely sexual relationship, which deteriorated after Nailah learned that Ina was pregnant with his child and that he had been seeing other women. Defendant claimed that he had not communicated with Nailah since September 7 or 8 and had not seen her since August.

¶ 45    On September 18, defendant said, he woke up around 11 a.m. and went to various places in Chicago—Lawrence Fisheries; the county building, to file some paperwork; and Mr. Lee's Foreign Auto, to address an outstanding invoice. Around 4 p.m., he left to meet up with Remi Ivanovas, a contractor he hired to renovate his condo, but Ivanovas never showed up.

¶ 46    Between 6 p.m. and 10:30 p.m., defendant claimed, he was shopping with his friends Hugh and Castra Echols. They picked him up at his condo; went to Target on Roosevelt Road,

where Hugh and Castra bought a gift from a baby registry; and drove him home. Defendant then went out for the evening, first meeting up with Joy and then with another woman, Lindsey Ashamalla, who spent the night at his condo.

¶ 47 When the detectives first questioned Hugh, in December 2007, he backed up defendant's initial statement, at least in its essentials. Hugh told the police that defendant went to Target with him and Castra on the evening of September 18 and that he dropped defendant home afterwards.

¶ 48 But during that interview, the detectives confronted Hugh with surveillance photos from Target that showed him and Castra walking into the store alone. And they brought Castra into the interview room, who impressed upon Hugh that this was a murder investigation, that the police were looking to implicate him, and that he needed to tell the truth. Based on cell-phone records to be detailed shortly, the police were indeed suspicious that Hugh was implicated in Nailah's murder, along with defendant (whom they would arrest that same day).

¶ 49 Hugh changed his story. He would repeat his revised statement to the grand jury and later at trial. He told the police that he went to Target with Castra, driving a Mercedes that belonged to defendant. They printed out a registry for a baby shower and shopped for a gift. Between 7 and 7:45 p.m., defendant called several times, said he was stranded in Hammond, and asked Hugh to come pick him up. He told Hugh to take the 159th Street exit off of I-94 and meet him at the first gas station across the Indiana state line.

¶ 50 Hugh and Castra arrived at the gas station around 9:15 p.m. and called defendant, who told Hugh that he went to the wrong station. Hugh drove to another gas station down the block. Defendant appeared from behind the station and got into the car. Surveillance footage showed Hugh pulling up to the gas station and driving away. Hugh drove through Calumet City and back up I-94 to take defendant home. Hugh said that this was the first and only time he was with

defendant on September 18.

¶ 51    Castra corroborated Hugh's account. She added that defendant said he was stranded in Hammond because he got into an argument with his uncle. Defendant did not appear dirty and did not have any visible marks on him when they picked him up.

¶ 52    In the coming days, defendant told Hugh that he had been or would be questioned by the police about Nailah's disappearance. (Phone records showed that defendant called Hugh three times shortly before he arrived at the station for the interview.) And Hugh admitted that he lied to the police at first. But he denied that he did so at defendant's behest; rather, he made up the story about defendant coming with them to Target on his own. (Never mind that defendant, who knew that Hugh and Castra were at Target from their phone conversations on September 18, had already told the police the same story.) Hugh also denied that defendant said the registry would be helpful as an alibi. A conversation between Hugh and defendant, recorded one day before Hugh was questioned, captured them discussing Target and the registry. Defendant told Hugh, "that baby registry does a lot."

¶ 53    Ivanovas, the contractor defendant supposedly went to meet and pay on September 18, testified that there was no such plan. Ivanovas started remodeling defendant's condo in August, but he stopped after defendant's first installment check of $5000 bounced. Ivanovas tried to collect the money, but defendant dodged his calls and never paid him.

¶ 54                                      VI

¶ 55    In addition to records that corroborated the various witnesses' testimony about incoming and outgoing calls and texts to and from Nailah, the State introduced historical cell-site location information (CSLI) for Nailah's, defendant's, and Hugh's phones. This evidence was introduced through the testimony of FBI Special Agent Michael Easter, who was qualified as an expert in

historical cell-site analysis. Agent Easter explained, in sum, that historical CSLI reveals the general vicinity of a phone, based on call-detail records that show the tower and tower sector that the phone accessed at that time. Unlike the Global Positioning System (GPS), CSLI does not reveal the precise location of the phone but rather a pie-shaped coverage area corresponding to the tower sector accessed by the phone. And because Nailah's records were retrieved so soon after her disappearance, they also included an "Access Distance Report," which allowed for more precise distance measurements from the cell towers. Agent Easter testified that his analysis of the CSLI was "consistent with" the phones being in the following locations.

¶ 56 On September 16, defendant's phone was at or near Nailah's condo building just before noon. (Sterling Gunn testified he saw defendant lurking in the parking lot "[l]ate morning, 11:00-ish, something like that.")

¶ 57 On September 17, defendant's phone was in the area of Nailah's condo from 7:40 until 10:39 p.m. (Sheila Gregory testified that she saw defendant in the hallway around 9:15 p.m.)

¶ 58 On September 18, the CSLI showed, in sum, that all three phones (defendant's, Nailah's, and Hugh's) were in the downtown Chicago area and then travelled to the areas in Calumet City and Hammond where the pharmaceutical boxes, Nailah's car, and Nailah's body were found. In Agent Easter's opinion, the call activity on defendant's and Nailah's phones was consistent with those phones being together from around 7 a.m. until shortly after 10 p.m.

¶ 59 In somewhat more detail, the September 18 data included the following:

(1) Nailah's phone was at or near her condo between 7:39 a.m. and 2:09 p.m. Defendant's phone was in the same area between 8:24 a.m. and 2:03 p.m., and the phones appeared to be in precisely the same location. Nailah's voicemail was accessed at 1:21 p.m. and again at 1:28 p.m., for 4 ½ minutes and 6 ½ minutes, respectively.

(2) Call activity from defendant's phone, between 3:47 p.m. and 3:59 p.m., and from Nailah's phone, between 3:52 p.m. and 3:59 p.m., showed both phones moving toward defendant's condo.

(3) Nailah's phone was at or near defendant's condo between 5:57 p.m. and 6:07 p.m. Between 6:07 p.m. and 7:28 p.m., there was no call activity on Nailah's phone.

(4) Defendant's phone was in the area of Nailah's condo between 6:24 p.m. and 6:49 p.m. It then started travelling very far south, tracking I-94/Dan Ryan Expressway.

(5) Defendant called Hugh at 7:10 p.m. Hugh's phone accessed a tower adjacent to the Target.

(6) At 7:44 p.m., defendant called Hugh again, using a tower sector facing the area where the pharmaceutical boxes were found, in the parking lot of the River Oaks Golf Course. Nailah's phone was in that same area from 7:44 p.m. to 7:47 p.m. Between 8:15 p.m. and 8:19 p.m., defendant's and Nailah's phones were both in that area and then in the area where Nailah's body was found.

(7) Between 7:45 p.m. and 9:02 p.m., Hugh's phone travelled south along I-94 to the area where Nailah's body and car were found.

(8) At 8:56 p.m., defendant's phone was in the area southeast of the parking lot where the boxes were found. At 8:57 p.m., defendant's phone was in the area where Nailah's body was found. At 9:13 p.m., it was in the area near where Nailah's car was found. Nailah's phone was in the same areas at these times. And Hugh's phone was in the same areas between 8:50 p.m. and 9:22 p.m.

(9) All three phones then headed north, along I-94, starting from the area where Nailah's car was found and then traveled west of I-94, near the 87th Street exit, which

was the area where Hugh and Castra had dropped off their daughter with a babysitter before heading out to Target and other destinations.

(10) Between 9:59 p.m. and 10:16 p.m., Nailah's phone travelled along I-94, just north of her condo and west of defendant's condo. Several 911 calls were placed from her phone between 10:14 and 10:16 p.m. After that, there was no further activity on Nailah's phone, indicating that it was either turned off or outside of the coverage area.

(11) Defendant's phone made and received several calls between 10:38 p.m. and 11:56 p.m. The phone was in the north Loop and points just north of downtown (consistent with Joy's testimony about meeting up with defendant) before heading toward defendant's condo shortly before midnight, where surveillance footage showed him pulling into the parking garage and then walking into the lobby.

(12) Hugh's phone made and received calls from 10:31 p.m. and onward, but none were to or from defendant's phone. Hugh's phone traveled toward Richton Park, where he lived.

¶ 60                                    VII

¶ 61    At trial, Nathaly and Ina testified to defendant's history of domestic violence. The trial court admitted this testimony as evidence of defendant's propensity to murder Nailah.

¶ 62    Nathaly and defendant were married in 2005. They already had a daughter, Amaya, and would soon have another daughter, Asa. They lived in an apartment in Naperville. Nathaly recounted several instances of physical abuse that she suffered at defendant's hands.

¶ 63    Soon after they were married, they got into an argument while Nathaly was driving on the freeway. Amaya, then four years old, was in the backseat. Defendant hit Nathaly in the face, near her right eye. She pulled over, screaming and crying. Defendant apologized, and Nathaly drove

home. Her eye was badly swollen; she missed some work and school and had to wear sunglasses for a time. But she kept the incident to herself because she was afraid of defendant and because he was on parole at the time.

¶ 64    In the summer of 2005, defendant pushed Nathaly onto a bed, climbed on top of her, and tried to suffocate her with a pillow. He pushed down hard enough that she could not breathe. She finally broke free and called out to Amaya, who came into the bedroom. Nathaly was going to call the police—until defendant said that he "can do a lot of damage to [her]" before they arrive.

¶ 65    Later in 2005, defendant attacked Nathaly and choked her with both hands until she could not breathe. He stopped only when Amaya came into the room.

¶ 66    By December 2005, the month Asa was born, defendant had moved out of the Naperville apartment and was living in Chicago. Sometime that month, he grabbed Nathaly by the arm and threw her to the floor. Nathaly was still too afraid to file a police report, but by January of 2006, she resolved to divorce defendant. And she told him so.

¶ 67    Defendant was enraged. He pushed Nathaly and hit her in the head, causing her to bleed from her left ear. He refused Nathaly's request to take her to a local emergency room, fearing that he would be arrested. Instead, he drove her to Northwestern Memorial Hospital in Chicago, dropped her off, and left.

¶ 68    Nathaly and the kids moved out of the apartment. At first, they moved into a townhouse in Aurora, owned by defendant and his father. Defendant's half-brother, Mark Rush, lived there, too. Defendant did not. Nathaly moved out later in 2006, and after a brief return to the apartment she used to share with defendant, she settled down in a different townhouse in Naperville.

¶ 69    Defendant maintained contact with Amaya and Asa. On Mother's Day in 2007, while dropping them off with Nathaly at her sister's house, an argument erupted. Nathaly tried to call

911, but defendant grabbed her phone and drove off.

¶ 70    A couple weeks later, in May, defendant showed up, unannounced and unwelcome, and got in Nathaly's face. She threatened to call the police; defendant screamed and taunted her to do so, boasting that he had the money to bail himself out on a domestic violence charge. As she dialed, defendant grabbed her hand and drove off with her phone, after a struggle that left Nathaly's arm bruised.

¶ 71    Nathaly called the police from a neighbor's phone. She filed for an order of protection the next day and, soon after that, for divorce. She did not allege physical abuse in the petition. The divorce was finalized in October 2007, shortly after Nailah's death.

¶ 72    Defendant started dating Ina in March 2006. They had a daughter, Ava, in June 2007, and Ina thought their relationship was exclusive. She lived with her parents in Maywood, but she was looking for a house with defendant. Ina worked for a real estate company, and defendant was interested in developing some of their properties, including a townhouse in University Village—the same complex where Nailah lived.

¶ 73    On September 8, 2007, amidst the heated communications with Nailah, defendant went to Ina's parents' house and asked for money, which Ina gave him. They started to argue. Defendant, who was holding Ava, then less than three months old, put her face down on a pile of covers on the bed and started choking Ina with both hands. He stopped when Ina's mother's tried to break the glass in the door, which defendant had locked, to get into the room. Defendant opened the door, grabbed Ava, and left the house. Ina followed defendant, but he pushed her down the stairs and drove off with Ava, who was not secured in a car seat. Ina called the police, and defendant came back to the house after they left. He was angry and started arguing with Ina's mother. Ina locked herself in an upstairs bathroom with Ava until the police arrived again.

¶ 74    Defendant came back the next day. He kicked the backdoor violently and screamed, "I'm losing my patience." The police removed him from the property. Three days later, Ina tried to file for an order of protection, but she went to the wrong courthouse. She eventually got the order on September 18, the day Nailah disappeared, and the day that Ina and Nathaly first got in touch. It took her almost a week because she was afraid to leave the house.

¶ 75                                    VIII

¶ 76    Defendant did not testify, but he did present an alibi defense. On September 16 and 17, counsel told the jury, defendant went to Nailah's condo, but she was out of town. This was all part of their on-again-off-again sexual relationship. He went to see her again on September 18, while he happened to be looking at an investment property in the same complex. They parted ways around 1 p.m. and went about their respective business. Later that evening, defendant coincidentally went to Hammond for an entirely unrelated purpose. The defense presented three witnesses to substantiate this alibi.

¶ 77    The first was Mark Rush, defendant's half-brother. He testified that in early 2006, he moved into a townhouse owned by defendant and defendant's father—the same townhouse where Nathaly and the kids lived for a time. (He also said that the townhouse was in Aurora, as Nathaly testified, but it had a Naperville zip code. At trial and on appeal, the parties have referred to it as a Naperville townhouse, so we will do the same.)

¶ 78    Unlike Nathaly, Mark testified that defendant lived there, too, until June 2006. While the couple had their squabbles, Mark never saw any hint that defendant was abusing Nathaly, and he thought that defendant had an "ideal" relationship with Amaya and Asa. After defendant moved out, Nathaly and the kids stayed in the townhouse until June 2007.

¶ 79    In September 2007, defendant still had some property in the townhouse—appliances, a

bedroom set, and office equipment—and he made plans to remove those items. Their mother had a first cousin named Tyrone Stevenson, who lived somewhere in Indiana.

¶ 80     Nancy Moreno owned a townhouse in University Village. She testified that it was up for sale in the fall of 2007, and that defendant was a prospective buyer. In September, he visited the property twice, at least once with a woman. On cross-examination, she admitted that she was not so sure of these dates and other particulars.

¶ 81     The lynchpin of defendant's alibi was Aaron Allen. Aaron was an old friend with whom defendant had recently reconnected and was "mentoring" in the real-estate investment business. Aaron testified that he spent much of September 18, 2007, chauffeuring defendant around town in his own car, a 1997 Oldsmobile Cutlass.

¶ 82     Aaron and defendant met up for breakfast. Defendant went back home. Aaron picked him up there around 10 a.m., drove him to the Daley Center, and waited in the car while defendant tended to his business. Around noon, they went to University Village to see the Moreno property. Defendant got out of Aaron's car and said he would be right back. He left Aaron waiting for 45 minutes. Aaron was annoyed that he did not get to see the property.

¶ 83     Around 1 p.m., they left the area and drove to Gold Coast Auto Body shop and then to a Bentley dealership. Around 4 p.m., Aaron drove defendant to Mr. Lee's, another body shop, to check on some repair work for his Mercedes. Defendant left with Aaron, leaving the Mercedes in the shop. Aaron drove him home around 6 p.m.

¶ 84     Aaron came back later to drive defendant to Hammond. They drove south on I-94 for a while but decided there was too much traffic. They got off at 87th Street and drove to a grocery store parking lot. Aaron waited in the car while defendant spoke to someone in the lot for 15 minutes. They got back on I-94, drove to I-57, and then took 159th Street to Hammond. Their

destination was 6534 Forest Avenue, the home of defendant's cousin Tyrone. (Some witnesses referred to Tyrone as a cousin; others called him an uncle. We do not know which is correct, but the parties, both at trial and on appeal, have referred to him as an uncle, and we will follow that practice.) There were "quite a few vehicles, vans and such" on Tyrone's driveway.

¶ 85    This location was two to three blocks from where Nailah's car was found and mere blocks from the gas station(s) where defendant later rendezvoused with Hugh and Castra.

¶ 86                                        IX

¶ 87    The jury specifically found that defendant murdered Nailah in a cold, calculated, and premeditated manner. The trial court sentenced defendant to life in prison. This appeal followed.

¶ 88                                    ANALYSIS

¶ 89                                        I

¶ 90    The State's case against defendant was based, in no small measure, on the historical CSLI generated by his cell phone. In *Carpenter v. United States*, 585 U.S. ___, 138 S. Ct. 2206 (2018), the United States Supreme Court held that a person has a legitimate expectation of privacy in the record of his or her physical movements as captured through this data. Thus, law enforcement's collection of CSLI is a search, and a warrant is generally required. *Id.* at ___, 138 S. Ct. at 2220-21.

¶ 91    In 2007—some 11 years before *Carpenter* was decided—the police collected defendant's CSLI without a warrant. Defendant now argues that, in the wake of *Carpenter*, the CSLI should be suppressed.

¶ 92                                        A

¶ 93    CSLI is location information generated by cellular carriers that indicates which cell tower a phone used during a particular communication. At its most precise—typically, in dense urban

areas (like Chicago), where high call volumes necessitate a concentrated network of cell towers, each with a relatively compact service area—CSLI can "pinpoint" a phone's location to within 50 meters. *Id.* at ___, 138 S. Ct. at 2219. Because cell phones are in constant communication with the nearest cell site, even when the subscriber is not actively employing any of the phone's ever-increasing functions, CSLI may be collected as frequently as several times a minute. *Id.* at ___, 138 S. Ct. at 2211-12. Quite apart from criminal investigations, cellular carriers collect and retain this data as a matter of course, for their own business purposes, such as network maintenance and billing. *Id.* at ___, 138 S. Ct. at 2212. And in case it was possible not to notice, nearly *everyone* uses a cell phone nowadays.

¶ 94    This confluence of features means that CSLI effectively compiles an "all-encompassing record" of nearly everyone's movements through public and private places alike. *Id.* at ___, 138 S. Ct. at 2217-18. It thus promises law enforcement an unprecedented tool for conducting "near perfect surveillance" of just about anyone, free from the vagaries of memory, the spottiness of record-keeping, and the other limitations of conventional surveillance techniques. *Id.* at ___, 138 S. Ct. at 2218. What's more, it allows the police to conduct this surveillance retrospectively, without having to know in advance who they will want to surveil, or where or when, in any given investigation: "Whoever the suspect turns out to be, he has effectively been tailed every moment of every day ***." *Id.* at ___, 138 S. Ct. at 2218.

¶ 95    CSLI's implications for individual privacy are profound and no doubt unsettling. These implications were not entirely lost on the lower courts that had to decide, before *Carpenter*, whether the fourth amendment requires law enforcement to get a warrant before collecting such comprehensive and potentially revealing data from cellular carriers. See, *e.g.*, *United States v. Thompson*, 866 F.3d 1149, 1155 (10th Cir. 2017) *vacated*, 585 U.S. ____, 138 S. Ct. 2706

(2018); *United States v. Carpenter*, 819 F.3d 880, 893 (6th Cir. 2016) (Stranch, J., concurring), *rev'd,* 585 U.S. ___, 138 S. Ct. 2206 (2018).

¶ 96    But whatever qualms they may have had, lower courts "do not write on a blank slate;" they are bound to follow existing Supreme Court precedents and doctrines until instructed otherwise by the Supreme Court itself. *Thompson*, 866 F.3d at 1154. And before *Carpenter*, every federal court of appeals (and as far as we know, every state reviewing court) held that the warrantless collection of CSLI was consistent with existing fourth amendment doctrine. *Id.* at 1155-57; *United States v. Graham*, 824 F.3d 421, 426 (4th Cir. 2016) (*en banc*); *Carpenter*, 819 F.3d at 889 (majority opinion); *United States v. Davis*, 785 F.3d 498, 511 (11th Cir. 2015) (*en banc*); *In re Application of the United States for Historical Cell Site Data*, 724 F.3d 600, 611-13 (5th Cir. 2013). Specifically, the consensus view was that the Supreme Court's "third-party doctrine" permitted this practice.

¶ 97    The third-party doctrine holds that a person has no legitimate expectation of privacy, or at least a significantly reduced expectation of privacy, in information that he or she voluntary turns over to third parties, even when the disclosure is made for a limited purpose. *Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2219; *United States v. Miller*, 425 U.S. 435, 443 (1976). Because the information is no longer protected by the fourth amendment once it is turned over, law enforcement is generally permitted to obtain it from the recipient (in the case of CSLI, the cellular carrier) without first getting a warrant.

¶ 98    The third-party doctrine largely originated in *Miller*, 425 U.S. 435, where the Supreme Court held that the government could subpoena the defendant's bank records—deposit slips, canceled checks, and the like—because he had voluntarily turned over this information to the bank in the ordinary course of business. In *Smith v. Maryland*, 442 U.S. 735 (1979), the Court

extended the doctrine to the information conveyed to a telephone carrier when a landline subscriber places a call. In the context of CSLI, *Smith* provides the more illuminating point of comparison—the landline being the precursor to the cell phone—so we will focus on that case.

¶ 99    *Smith* held that the government's use of a pen register, which records the outbound numbers dialed on a landline, was not a search. The Court doubted that the subscriber had an *actual* expectation of privacy, and it held that the subscriber has no *legitimate* expectation of privacy, in the dialed numbers. *Id.* at 742-44. After all, the average telephone user surely understands that a dialed number is, necessarily, conveyed to the telephone company and used for legitimate business purposes—to route the call and tally up the charges, if nothing else. *Id.* at 743. When placing a call, the subscriber thus "voluntarily convey[s]" the dialed number to the carrier by exposing the carrier's equipment to that information "in the ordinary course of business." (Internal quotation marks omitted.) *Id.* at 744. In so doing, the subscriber "assume[s] the risk" that this information may be turned over to law enforcement without the safeguards afforded by the fourth amendment. *Id.* at 745.

¶ 100   Before *Carpenter*, the prevailing view in the lower courts was that *Smith*, by extension, permitted law enforcement to acquire CSLI without a warrant. Briefly, think of CSLI as a souped-up pen register: it compiles information that is turned over to the carrier when the subscriber places a call (or uses other functions of modern smart phones). And the information is collected, in the first instance, by the carriers, not the government, to be used for the carrier's own business purposes and stored in their own routine business records. Granted, CSLI divulges vastly more sensitive, personal information than a pen register ever could, but this difference in degree does not remove CSLI from the scope of the third-party doctrine. Like the numbers dialed on a landline, CSLI is information disclosed to the telephone company in the ordinary course of

business, and whoever discloses information in this manner cannot claim the protections of the fourth amendment. Or so *Smith* and *Miller* were thought to hold.

¶ 101 But in *Carpenter*, 585 U.S. at \_\_\_, 138 S. Ct. at 2217, the Supreme Court "decline[d] to extend *Smith* and *Miller*" to the "novel" and "unique" circumstances presented by CSLI. For one, the Court held that a pen register and CSLI are different in kind, not just in degree: Unlike a list of dialed numbers, a subscriber's CSLI can reveal an all-encompassing, around-the-clock record of one's movements through private and public places alike. *Id.* at \_\_\_, 138 S. Ct. at 2216-19. The Court held that an individual has a legitimate claim of privacy in the whole of his or her physical movements. *Id.* at \_\_\_, 138 S. Ct. at 2217. The collection of CSLI invaded that interest.

¶ 102 And while *some* of a cell-phone subscriber's CSLI is generated by the subscriber's own affirmative acts, like placing a call or texting, much of it is not. Modern smart phones generate a significant amount of CSLI just by being connected to the network. Short of disconnecting the phone from the network altogether—hardly a realistic alternative for most people nowadays—there is no way to avoid leaving behind a detailed record of one's movements. *Id.* at \_\_\_, 138 S. Ct. at 2220.

¶ 103 It may be obvious to the average telephone user that the numbers one dials are disclosed to the carrier, but it is unlikely that the average cell-phone user is aware that simply turning on a phone automatically begins to generate a nearly complete dossier of his or her movements. *Id.* at \_\_\_, 138 S. Ct. at 2220. It is simply too much to charge the average person with having assumed the risk that the cell-phone company might turn over anything like *that* to the police for investigative purposes—as if we have all voluntarily submitted to a "tireless and absolute surveillance" by government authorities, just by dint of having a working cell phone. *Id.* at \_\_\_, 138 S. Ct. at 2218, 2220.

¶ 104   On balance, the mere fact that a cell-phone user's CSLI is obtained from a third party that collected the data in the ordinary course of business—with the limited element of voluntary disclosure that entails—is outweighed by the novel and extraordinary privacy interests at stake. The fourth amendment does not allow law enforcement unfettered access to information of this "depth, breadth, and comprehensive reach" without judicial oversight; a warrant supported by probable cause generally is required. *Id.* at ___, 138 S. Ct. at 2220-21, 2223.

¶ 105   The qualifier "generally" marks two caveats to this holding. First, the usual exceptions to the warrant requirement, including the exigent circumstances exception, still apply. *Id.* at ___, 138 S. Ct. at 2222-23. Second, the Court declined to decide whether there might be a limited period for which law enforcement could collect a person's CSLI without triggering the warrant requirement. *Id.* at ___, 138 S. Ct. at 2217 n.3. But wherever that line may be drawn, if anywhere, the seven days' worth of CSLI collected in *Carpenter* stepped over it.

¶ 106   So, too, did the 23 days' worth of CSLI collected from defendant. There is no doubt that under *Carpenter*, police would have required a warrant to obtain defendant's CSLI.

¶ 107                                                        B

¶ 108   *Carpenter* settles the underlying fourth amendment question, but because that decision post-dates the police conduct here by over a decade, it does not speak directly to any remedy to which defendant may be (retroactively) entitled. That question is controlled by a separate doctrine—the good-faith exception to the exclusionary rule. See, *e.g.*, *Illinois v. Krull*, 480 U.S. 340, 368-69 (1987) (O'Connor, J., dissenting) (exclusionary rule renders new fourth amendment decisions purely prospective, in that they do not even apply to the parties before the Court); *United States v. Carpenter*, 926 F.3d 313, 317-18 (6th Cir. 2019) (denying Carpenter relief, on remand, based on good-faith exception); *United States v. Chavez*, 894 F.3d 593, 608 (4th Cir.

2018) (*Carpenter* is "controlling going forward" but does not afford relief to defendant whose CSLI was collected beforehand).

¶ 109   Once the defendant has shown a fourth amendment violation, as he has here, it is the State's burden to prove that the good-faith exception applies. *People v. Turnage*, 162 Ill. 2d 299, 313 (1994); see also *People v. Manzo*, 2018 IL 122761, ¶ 65. We review this question of law *de novo*. *Manzo*, 2018 IL 122761, ¶ 67.

¶ 110   Because there is no *constitutional* right to the suppression of illegally obtained evidence, the *judicially* created exclusionary rule is to be applied only where its benefits outweigh its social costs. *Davis v. United States*, 564 U.S. 229, 236-37 (2011). The sole objective of exclusion is to deter future fourth amendment violations. *Id.* Thus, the exclusionary rule applies only when the conduct of the police, in violating the defendant's fourth amendment rights, was " 'sufficiently deliberate' " that deterrence may be effective and " 'sufficiently culpable' " that deterrence will outweigh the substantial social costs of excluding reliable, probative evidence of guilt. *People v. LeFlore*, 2015 IL 116799, ¶ 24 (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)).

¶ 111   When the police act with an "objectively reasonable good-faith belief" that their conduct was lawful, the exclusionary rule's deterrence rationale "loses much of its force and exclusion cannot pay its way." (Internal quotation marks omitted.) *Id.* Because the " 'pertinent analysis of deterrence and culpability is objective,' " it is " 'not an inquiry into the subjective awareness of [the] officers.' " *Id.* ¶ 25 (quoting *Herring*, 555 U.S. at 145). Rather, we ask "the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.' " *Id.* (quoting *Herring*, 555 U.S. at 145).

¶ 112   Thus, the reasoning behind the good-faith exception to the exclusionary rule. This exception has been recognized in various contexts. One is when law enforcement acts in

reasonable reliance on a *statute* authorizing a warrantless search, though that statute is later determined to be unconstitutional. See *Krull*, 480 U.S. at 351-52 (majority opinion). Another— the original one—is when the police reasonably rely on the issuance of a *warrant* that is later deemed defective because it was based on an unconstitutional statute. See *United States v. Leon*, 468 U.S. 897, 919-22 (1984).

¶ 113   And a third employment of the good-faith exception to the exclusionary rule occurs when the police conduct a warrantless search under an objectively reasonable belief that their actions were sanctioned by "binding appellate precedent" in existence at the time, even though that precedent is later overruled or limited. *LeFlore*, 2015 IL 116799, ¶ 27; *Davis*, 564 U.S. at 232. We will begin with a focus on this version of the good-faith exception.

¶ 114   The rule announced in *Davis*, and adopted by our supreme court in *LeFlore*, holds that an officer's belief that a warrantless search is permissible is objectively reasonable if, among other reasons, it was supported at the time by "binding appellate precedent" that was later overruled or limited. *LeFlore*, 2015 IL 116799, ¶ 27; *Davis*, 564 U.S. at 232. Here, then, the question is whether it was objectively reasonable for the police to believe, based on then-existing "binding appellate precedent," that they did not need a warrant to obtain defendant's CSLI.

¶ 115   "Binding appellate precedent" is a term of art in this context. For a state law enforcement officer, it obviously includes cases directly on point from the state's reviewing courts and the United States Supreme Court. But when there are no such cases, it also includes cases directly on point from the officer's local federal circuit. See *Davis*, 564 U.S. at 239-40 (Eleventh Circuit precedent binding for Alabama police); *LeFlore*, 2015 IL 116799, ¶ 56 (Seventh Circuit precedent binding for Illinois police).

¶ 116   As of 2007, however, when defendant's CSLI was collected without a warrant, there was

no such precedent, either from an Illinois reviewing court or from the Seventh Circuit. *People v. Strickland*, 2019 IL App (1st) 161098, ¶ 65 (as of 2013, the court "found no Illinois case law that expressly allowed or prohibited the acquisition of CSLI without a search warrant" and "similarly failed to find any binding appellate precedent in the Seventh Circuit").

¶ 117   The United States Supreme Court has not yet said whether an officer may reasonably rely on precedents from *other* federal circuits for purposes of the good-faith exception, and the question remains a point of debate among the federal courts of appeals. See *United States v. Brown*, 744 F.3d 474, 478 (7th Cir. 2014). Our own supreme court, however, has said that the answer is yes. In *LeFlore*, 2015 IL 116799, ¶ 54, our supreme court doubted that there was any deterrent value to be gained by telling officers that they cannot rely on the decisions of other federal circuit courts when there is no local precedent to provide the guidance they need. And relying on other circuits' precedents would seem especially reasonable when those circuits had reached a consensus view. See *id.* ¶ 41.

¶ 118   As noted above, every federal circuit to decide the question before *Carpenter* held that a defendant's CSLI may be collected from a third-party carrier without a warrant. But those cases are not "binding appellate precedents" for our purposes here, because they were all decided *after* the police collected defendant's CSLI in 2007. You can't rely on case law that doesn't yet exist.

¶ 119   Indeed, in 2007, this issue was first making its way through the trial courts. Appellate resolution was still a ways off, and there were no precedents directly on point for the officers to go on. The State's claims to the contrary are anachronistic.

¶ 120   Defendant takes this lack of precedent as a point in his favor. And it is, to some extent, although he makes too much of it. An officer's claim that his or her conduct was reasonable, despite being declared unconstitutional later, is at its strongest when existing appellate authority

specifically authorized that very conduct. But the absence of any directly applicable local precedent surely cannot automatically mean the opposite—that the officer's conduct was *per se* *un*reasonable. That would ignore the realities of law enforcement's response to crime. Officers on the beat often and necessarily confront the emerging fourth amendment issues wrought by technological change before any reviewing court can weigh in. It cannot be the case that these officers have *nowhere* they can reasonably turn to in the case law for guidance, or that their actions *cannot* be reasonable unless they have already been specifically blessed by appellate precedent. See *id.* ¶¶ 19-20 (rejecting this "narrow" reading of *Davis* good-faith exception).

¶ 121    For reasons like this, and with a vast body of federal circuit precedent on its side, our supreme court held in *LeFlore* that officers may reasonably rely on a well-established doctrine that is " 'not exactly on point' " if its underlying rationale is nonetheless " 'sufficiently clear and apposite' " and thus " ' "widely and reasonably understood," ' " to apply to the novel circumstance in question. *Id.* ¶¶ 20, 44 (quoting *United States v. Stephens*, 764 F.3d 327, 337-38 (4th Cir. 2014), and quoting *United States v. Sparks*, 711 F.3d 58, 65 (1st Cir. 2013)). And this may be so even if the United States Supreme Court later found that novel circumstance to be distinguishable in a way that was significant—or even dispositive—under the fourth amendment.

¶ 122    *LeFlore* is, itself, an example. Three years before the Supreme Court in *United States v. Jones*, 565 U.S. 400 (2012), held the practice unconstitutional, the police in *LeFlore*, 2015 IL 116799, ¶¶ 3-4, installed a GPS tracking device on the defendant's car (or more precisely, a car in which the defendant had a possessory, and thus a privacy, interest). But our supreme court held that the good-faith exception applied—among other reasons, because existing appellate precedent, in the form of two previous Supreme Court decisions, would have suggested to officers that installation of the GPS tracking device did not require a warrant. See *United States*

*v. Knotts*, 460 U.S. 276, 285 (1983) (police act of *monitoring* location-tracking signal from beeper in car was not search); *United States v. Karo*, 468 U.S. 705, 707, 713 (1984) (*installing* beeper not "search" if owner consents, though property is later transferred to third party subjected to surveillance).

¶ 123   Even though *Jones*, 565 U.S. at 404-11, later distinguished those cases and emphasized the physical trespass associated with the GPS device installation, *Knotts* and *Karo* were the most applicable Supreme Court decisions at the time, and neither case gave the police in *LeFlore* any clear reason to think that they needed a warrant to install and monitor a GPS tracking device.

¶ 124   Just as *Knotts* and *Karo* were binding appellate precedent before *Jones*, here, the third-party doctrine, and the holding in particular of *Smith*, 442 U.S. at 742-45, that a warrant was not required to obtain a landline user's pen register, was binding appellate precedent before *Carpenter*. Even in declining to apply the doctrine to CSLI, the Court never doubted that the collection of CSLI "implicates" the third-party doctrine and its underlying principles. *Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2216. After all, whatever else may be true of CSLI, it is data that the defendant turned over to a third party in the ordinary course of business.

¶ 125   The analysis of CSLI, for fourth amendment purposes, therefore had to begin with the third-party doctrine. If the analysis did not end with the doctrine, as the Court in *Carpenter* ultimately held, that was only because CSLI, and the technological advances of the digital age more generally, had opened up new possibilities for sweeping government surveillance and therefore posed new and unprecedented threats to individual privacy. These developments had pushed the Court toward recognizing a protected privacy interest in the sum-total of one's physical movements. See *id.* at ___, 138 S. Ct. at 2217. Because a "mechanical[ ]" application of the third-party doctrine to CSLI posed too grave a threat to this newly recognized privacy

interest, the doctrine could not be extended into this novel context. *Id.* at \_\_\_, 138 S. Ct. at 2219.

¶ 126   But in 2007, when defendant's CSLI was collected, this privacy interest had not yet been recognized. In fact, the courts had only just begun to grapple with CSLI's privacy implications. With no appellate precedents directly on point, much less a case calling into question the third-party doctrine's application in this context, the existing case law offered the police no reason to think that they were about to tread on a forthcoming constitutional right. At the time, it was objectively reasonable to rely on the closest, albeit not perfectly apposite, scenario addressed in well-settled case law—the pen register cases applying the third-party doctrine to landline records.

¶ 127   The case for a good-faith exception here is stronger than it was even in *LeFlore*. There, the case that ultimately ruled warrantless GPS surveillance unconstitutional, *Jones*, did not mark a drastic departure from existing law at the time police installed the GPS device—a departure, but not a radical one. The Court in *Jones*, 565 U.S. at 404-11, emphasized that it was merely restoring to prominence the traditional, property-based conception of privacy that had historically been part of the fourth amendment doctrine.

¶ 128   Here, in contrast, *Carpenter* ushered in a far more sweeping change, enshrining into law a new conception of privacy, after finding the traditional third-party doctrine an ill fit for the new privacy concerns of the digital age. Thus, if the police in *LeFlore* could not be faulted for failing to abide by the modest holding that would emerge from *Jones*, even less can they be faulted here for failing to abide by the watershed holding that would emerge from *Carpenter*.

¶ 129   This conclusion was borne out by the circuit-level precedent to emerge in the coming years. As noted above, every federal circuit to consider the issue pre-*Carpenter* held that the third-party doctrine, established in the pen-register context, extended to CSLI. In the Tenth

Circuit's phrase, the third-party doctrine, in its pre-*Carpenter* form, "bound" the lower courts to reach that result until such time as the Supreme Court itself said otherwise. *Thompson*, 866 F.3d at 1159; see also *United States v. Ulbricht*, 858 F.3d 71, 97 (2d Cir. 2017) (appellate court similarly "bound" to apply third-party doctrine to collection of internet user's Internet Protocol addresses.)

¶ 130 While those circuit-level cases were not themselves binding appellate precedents at the time—they came down after the police conduct in question here—they are still relevant to the good-faith analysis, to this extent: They are compelling evidence that the actions taken here by the police in 2007 were supported by an objectively reasonable interpretation of existing Supreme Court authority. If every circuit court to consider the question, pre-*Carpenter*, determined that a warrant was not required to obtain a user's CSLI, we certainly cannot say that it was objectively unreasonable for the police in this case to have reached the same conclusion.

¶ 131 Because a reasonable officer would have viewed the warrantless collection of CSLI as constitutionally permissible, under the third-party doctrine and *Smith*, the *Davis/LeFlore* good-faith exception applies.

¶ 132                                                       C

¶ 133 We are by no means the first reviewing court to apply the good-faith exception to the warrantless collection of CSLI before *Carpenter*. To the contrary, the good-faith exception, in one form or another, has been routinely applied in these circumstances. But we may be the first, or among the first, to base the exception squarely on the third-party doctrine. *Cf. United States v. Zodhiates*, 901 F.3d 137, 144 (2d Cir. 2018), *aff'g* 166 F. Supp. 3d 328, 334 n.8, 336 n.9 (W.D.N.Y. 2016) (appellate court applied good-faith exception based on third-party doctrine to

general cell-phone location information acquired from subpoenaed billing records that, as federal district court noted, was not CSLI and thus raised similar but attenuated privacy concerns).

¶ 134   We have chosen this exception because we may affirm the trial court's judgment on any basis in the record, regardless of the trial court's reasoning. *People v. Lee*, 2016 IL App (2d) 150359, ¶ 14. And defendant has called into question a path that, in most jurisdictions, would be a much simpler and direct one to upholding the police officer's conduct here.

¶ 135   As noted above, *Krull*, 480 U.S. at 351-52, holds that when law enforcement reasonably acts pursuant to a statute authorizing a warrantless search, it acts in good faith, even if that statute is later deemed unconstitutional. And law enforcement routinely collected CSLI pursuant to section 2703(d) of Title 18 of the United States Code, commonly referred to as the Stored Communications Act (SCA), albeit under a standard falling well short of probable cause. See 18 U.S.C. § 2703(d); *Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2221.

¶ 136   But it was a valid statute no less, pre-*Carpenter*, and governmental reliance on that law was deemed sufficient under *Krull* to fit within the good-faith exception. See *United States v. Beverly*, 943 F.3d 225, 235 (5th Cir. 2019); *Carpenter*, 926 F.3d at 317; *United States v. Korte*, 918 F.3d 750, 757-59 (9th Cir. 2019); *United States v. Goldstein*, 914 F.3d 200, 204 (3d Cir. 2019); *United States v. Curtis*, 901 F.3d 846, 848-49 (7th Cir. 2018); *Chavez*, 894 F.3d at 608.

¶ 137   Defendant says that direct route is not available to us, because our supreme court has rejected the *Krull* doctrine as applied to the Illinois Constitution. See *People v. Kreuger*, 175 Ill. 2d 60, 70-74 (1996) (statute held unconstitutional is void *ab initio* and cannot be used to validate governmental actions, even those undertaken before it was found unconstitutional); *People v. Wright*, 183 Ill. 2d 16, 25 (1998) (reaffirming *Krueger*).

¶ 138   The State and defendant grapple extensively over whether *Krueger* applies to our situation or whether *Krull* would apply here. We need not take up those arguments. We have held above that the *Davis*/*LeFlore* exception applies—that the applicable case law, at the time the police here gathered the CSLI, would have led officers to reasonably believe that a warrant was not required to collect it. So the validity of the federal CSLI-collection statute is irrelevant.

¶ 139   We would say the same of yet a third version of the good-faith exception—the original one established in *Leon*, 468 U.S. at 919-21, which holds that the exclusionary rule does not apply when the police reasonably relied on a *warrant* issued by a judge that later turned out to be defective because it relied on an unconstitutional statute. At least one federal circuit has applied *Leon* (rather than *Krull*) when the CSLI was collected pursuant to a court order issued under section 2703(d) of the SCA. *United States v. Joyner*, 899 F.3d 1199, 1204-05 (11th Cir. 2018) (*per curiam*).

¶ 140   The State would have us do something of a like nature here, reasoning that even if the police may not rely on an unconstitutional statute per *Krueger*, all is forgiven if a *judge* does so in issuing a court order authorizing the collection of the CSLI. We are skeptical of that reading of *Krueger*, 175 Ill. 2d at 62, given that a judge there issued a warrant under the unconstitutional statute in that case, which did not stop our supreme court from invalidating that conduct.

¶ 141   But we need not delve into those details, either. We have found the *Davis*/*LeFlore* good-faith exception applicable, and that is enough to validate the police conduct here in obtaining CSLI records without a warrant based on the third-party doctrine.

¶ 142                                    D

¶ 143   Defendant also argues that, even if this good-faith exception applied based on the controlling, applicable appellate precedent at the time, there is another reason it should not be

employed here: because the police twice obtained his CSLI "by improper means" and therefore did not act in "objective good faith."

¶ 144   First, on October 5, 2007, while the State was before the grand jury, Detective Jacobson applied for a court order authorizing the collection of defendant's CSLI for the period of September 13 through October 5, 2007. On that same day, the grand jury also issued a subpoena for this same information. Defendant says nothing about the grand jury subpoena in his opening brief, and we can, for the most part, leave it aside. But we will say this much in passing: The State's belt-and-suspenders approach, if legally flawed, still strikes us as evidence of a concerted effort to ensure that defendant's CSLI was being lawfully collected.

¶ 145   In any event, Detective Jacobson applied for an order, and the presiding judge of the circuit court issued an order, pursuant to section 3123 of the Electronic Communications Privacy Act of 1986 (ECPA) (18 U.S.C. § 3123 (2012)). Section 3123 appears in Title III of the ECPA, which governs pen registers. CSLI is governed by Title II of the ECPA, which is also commonly known as the SCA.

¶ 146   The standard in section 3123 for a pen-register order is less demanding than the standard in section 2703(d) for a CSLI order. Section 2703(d) requires a showing of "specific and articulable facts," which allows a neutral magistrate to decide whether "there are reasonable grounds to believe" that the requested CSLI is "relevant and material to an ongoing criminal investigation." *Id.* § 2703(d). In contrast, section 3123 only requires a judge to ensure that a law enforcement officer "*has certified to the court* that the information likely to be obtained by [the pen register] is relevant to an ongoing criminal investigation." (Emphasis added.) *Id.* § 3123(a)(2).

¶ 147   Section 3123 does not require a showing of specific and articulable facts because it does not require a neutral magistrate to independently determine whether a substantive standard has been met. See *United States v. Hallmark*, 911 F.2d 399, 402 (10th Cir. 1990); *United States v. Ellis*, 270 F. Supp. 3d 1134, 1146 (N.D. Cal. 2017) (statute does not "requir[e] a factual basis for the certification"); *In re Application of the United States of America*, 846 F. Supp. 1555, 1559 (M.D. Fla. 1994) ("No provision appears for independent judicial inquiry ***").

¶ 148   Rather, the "extremely limited judicial review" required by the pen-register statute is "intended merely to safeguard against purely random use of this device." *Hallmark*, 911 F.2d at 402. To this minimal end, it requires a law enforcement officer (1) to certify to a judge that, in the officer's own assessment, the pen register is likely to yield information that is relevant to an ongoing criminal investigation and (2) to provide certain information, like the identity of the officer(s) involved, in case the statute's remedial scheme (which provides for fining and even imprisoning officers who violate the statute, but not for excluding evidence) is later invoked. 18 U.S.C. § 3123(a)(2)-(3) (2012).

¶ 149   The State conflates these standards. So did the trial judge below, in ruling on defendant's motion to suppress the CSLI. The trial judge found that in entering a pen-register order pursuant to section 3123, the presiding judge implicitly found that the requirements for a CSLI order under section 2703(d) were satisfied. For this reason, the State argues, the reference to section 3123 was nothing more than a harmless citation error.

¶ 150   Not so. The presiding judge merely found "that *the applicant has certified* that the information likely to be obtained by [*sic*] and used is relevant to an ongoing criminal investigation into the death of Nailah Franklin." (Emphasis added.) That finding, which tracks section 3123, does not imply that the presiding judge independently determined, on the basis of

specific and articulable facts presented to the court, that the standard for a CSLI order was satisfied. There is no basis in the order, or anywhere else in the record, for that claim. The order did not comply with section 2703(d).

¶ 151   The upshot of this conclusion, as defendant would have it, is that the police cannot claim reasonable reliance, for purposes of the good-faith exception, on section 2703(d) or the presiding judge's order. To put the same point differently: If defendant is right, neither the good-faith exception in *Krull* (for reliance on a statute) nor in *Leon* (for reliance on a warrant) applies here.

¶ 152   But as we have said, we are not relying on the *Krull* or *Leon* versions of the good-faith exception. We are relying on the *Davis/LefloreLeFlore* good-faith exception. At the time, a reasonable officer could have concluded that the fourth amendment did not require a warrant because the third-party doctrine, per *Smith*, applied to the collection of CSLI. And nothing in defendant's argument speaks to, much less changes, that conclusion. Our good-faith analysis under *Davis* and *LeFlore* does not require a finding that the police reasonably relied on either the statute or the presiding judge's order—only on prevailing appellate precedent at the time.

¶ 153   Defendant's own citation, *Ferrari v. State*, 260 So. 3d 295 (Fla. Dist. Ct. App. 2018), illustrates our point. In that case, the Florida appellate court held that an officer who collected CSLI by means of a subpoena was not "acting in reasonable reliance" on a state statute because the statute required (at least) a court order, and the officer made no attempt to get one. *Id.* at 305-06. The consequence? Because law enforcement could not claim reasonable reliance on a statute that it failed to comply with, the *Krull* good-faith exception did not apply. See *id.* (citing *Krull*, 480 U.S. 340). But that speaks only to the *Krull* exception. Nothing in that decision lays a glove on the *Davis* good-faith exception, applied in Illinois under *LeFlore*, focusing not on a statute but on the prevailing, controlling case law.

¶ 154   Defendant takes the argument one step further. He contends that the statutory infirmity in the presiding judge's order was the product of deliberate misconduct by Detective Jacobson, who disingenuously invoked the ECPA's *pen-register* provision, rather than the *CSLI* provision, for the express purpose of making it easier to obtain defendant's CSLI. Specifically, this tactic was meant to relieve the police of the burden of providing specific and articulable facts in support of the application for a court order. And this, defendant says, is "exactly the sort of unlawful activity that the exclusionary rule is designed to deter."

¶ 155   The exclusionary rule is designed to deter future violations of *constitutional* rights. See, *e.g.*, *Mapp v. Ohio*, 367 U.S. 643, 655 (1961) ("evidence obtained by searches and seizures in violation of the Constitution is *** inadmissible in a state court"); see also *Davis*, 564 U.S. at 236 (rule created to " 'compel respect for the constitutional guaranty' " (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)); *Herring*, 555 U.S. at 147 (rule meant to deter "disregard of constitutional requirements"); *United States v. Calandra*, 414 U.S. 338, 348 (1974) (rule meant "to safeguard Fourth Amendment rights").

¶ 156   So if an officer deliberately evades a *fourth amendment* requirement—for example, if the officer misleads the judge about the facts used to establish probable cause for a warrant—the good-faith exception will not apply, and the officer cannot rely on the warrant procured by his or her own misrepresentations, since that is precisely the kind of misconduct that the exclusionary rule is meant to deter. *Leon*, 468 U.S. at 923.

¶ 157   But if, as we have concluded, an officer could have reasonably believed at the time that collecting CSLI without a warrant was constitutional, then the "unlawful activity" defendant alleges amounts to nothing more than *statutory* non-compliance. And on its own, statutory non-compliance, whether deliberate or mistaken, does not violate the fourth amendment. Defendant's

argument thus depends on the premise that the exclusionary rule applies to violations of purely statutory requirements.

¶ 158   Defendant cites no authority that supports this premise, and we are not aware of any. To the contrary, federal case law overwhelmingly rejects this premise. See, *e.g.*, *United States v. Giordano*, 416 U.S. 505, 508, 523 (1974) (violation of Title III wiretapping statute implicated *statutory* remedy of suppression but not exclusionary rule); *United States v. Adams*, 740 F.3d 40, 43 (1st Cir. 2014) ("statutory violations, untethered to the abridgement of constitutional rights," do not justify exclusion); *United States v. Dawson*, 425 F.3d 389, 394 (7th Cir. 2005) ("as a device for enforcing nonconstitutional rules," exclusion is "disfavored"); *United States v. Thompson*, 936 F.2d 1249, 1251 (11th Cir. 1991) (collecting cases from federal circuits holding that exclusionary rule does not apply to statutory violations).

¶ 159   And our supreme court has held that our state exclusionary rule does not apply to purely statutory, non-constitutional violations. *People v. Carlson*, 185 Ill. 2d 546, 555-60 (1999) (under *Krueger*, officers may reasonably rely on warrant with statutory defect for purposes of good-faith exception).

¶ 160   So while the conduct defendant alleges would do the police no credit, it would not trigger the exclusionary rule or provide a basis for suppressing the CSLI. (Unless, of course, the statute itself made that remedy available, but the SCA does not. See 18 U.S.C. §§ 2707, 2708, 2712 (SCA's remedial scheme); *United States v. Gasperini*, 894 F.3d 482, 489 (2d Cir. 2018).) Thus, it does not negate the State's assertion of the good-faith exception.

¶ 161   What's more, the record does not bear out defendant's allegation that the court order was obtained by means of deliberate police misconduct. It is one thing to allege that an officer misled the court about the basis for a finding of probable cause. Having no independent knowledge of

the facts, the judge, in this context, is at the mercy of the officer's representations. See *Leon*, 468 U.S. at 923. But here, defendant alleges that the detective deliberately misled the court about a question of law—in particular, the correct construction of the ECPA.

¶ 162   Defendant's guiding thought is this: Detective Jacobson "knew" his application for a court order failed to comply with the ECPA, even if the presiding judge and trial judge evidently did not. And on what basis are we asked to draw this inference? As an "electronic surveillance officer," the detective (not to mention the supervising state's attorney) *must have known* the different standards that Congress established in the ECPA for different modes of electronic surveillance. So the error in the detective's application must have been calculated.

¶ 163   That inference is dubious at best. It bears repetition that the detective's understanding of the ECPA passed muster with two judges. And although that understanding was wrong, we are mindful that in 2007, this area of the law was only first emerging. It is not entirely implausible, as the State insists, that pen registers and CSLI—along with the statutory provisions that apply to each—were sometimes conflated. Perhaps that is what happened here; indeed, the trial judge went so far as to say that in 2007, courts and litigants often used the terms "cell-site location" and "pen register" interchangeably. In any event, defendant has not shown that the error was anything worse than a garden-variety error. His first allegation of "unlawful activity" is unfounded.

¶ 164   Second, before the court order (or grand-jury subpoena) was issued, and before Nailah's body was found, the police obtained at least some of defendant's CSLI by requesting it directly from the carrier. In defendant's view, that initial request for his location data had nothing to do with trying to find Nailah alive; by then, the police had already concluded that defendant murdered her. The police were thus "desperate" to arrest defendant, but they knew they did not

have probable cause. So they set out to gather evidence against defendant and develop probable cause by "unlawful" means—that is, by deliberately bypassing section 2703(d) of the SCA.

¶ 165     This argument suffers from the same legal deficiency as the last one. If the police could have reasonably believed at the time that collecting defendant's CSLI did not trigger the fourth amendment, based on the third-party doctrine and *Smith*, then the "unlawful" conduct defendant alleges is just one more effort to evade a purely statutory requirement. Again, we would not condone that kind of conduct from the police, but we have no authority to apply the exclusionary rule in (alleged) circumstances like these.

¶ 166     And the record, which is exceedingly sparse on this issue, does not bear out defendant's allegation, anyway. In sum, all we really know is that sometime between September 21 (when the police first interviewed defendant, three days after Nailah went missing) and September 28, 2007 (when Detective Jacobson applied for a warrant to search defendant's home and computer, the day after Nailah's body was found), the police requested and obtained some of defendant's CSLI from his carrier. The scope of the request is unknown, and the request may or may not have been styled as an "exigency request," submitted as part of a missing person's investigation. For what it's worth, on September 21, 2007, the police submitted such an "exigency request" for the prior three days' worth of Nailah's own CSLI. (That is, starting from September 18, when she was last seen—with defendant.) The State asserts that the request for defendant's CSLI paralleled the request for Nailah's CSLI in these respects. That is not implausible, but it is also not established by the record.

¶ 167     In fact, the record does not permit us to draw any definitive conclusions, one way or the other. Because the request for defendant's CSLI is not in the record and was not the subject of any testimony at trial or at a pretrial hearing (unlike the request for *Nailah's* CSLI), we cannot

say for sure when it was made, how broad it was, or whether it was a reasonable request to make as part of a missing-person's investigation. But it is certainly not implausible, given what little we know, that the request was made for exactly that purpose. Whatever the specifics of the request may have been, defendant does not dispute that it was made before Nailah's body was found; yet he would have us conclude that the police had abandoned all hope of finding Nailah alive and were simply trying to build a case against him while sidestepping the legal (more precisely, statutory) constraints on their collection of evidence. As the record stands, that is nothing more than speculation.

¶ 168    Because the record is undeveloped on the relevant points, defendant cannot support his allegations that the police engaged in misconduct of any kind, much less misconduct of the kind that the exclusionary rule is meant to deter. The State has carried its burden of showing that the *Davis/LeFlore* good-faith exception applies, based on the third-party doctrine, and defendant's unsupported allegations of misconduct do not show otherwise.

¶ 169    Because we find no basis for a claim of police misconduct here, it is unnecessary to consider many of the arguments the parties debate, such as whether the exigent-circumstances exception to the warrant requirement applies; whether the inevitable-discovery doctrine applies; whether the search warrant for defendant's home was "based on illegally obtained CSLI," such that the fruits of the search must be suppressed; and whether any or all of these arguments were forfeited by the other side in the trial court. We will leave the matter at that. Defendant is not entitled to suppression of the CSLI.

¶ 170                                                        II

¶ 171    Defendant's alleged acts of domestic violence against Nathaly Figueroa and Ina Dorsey were admitted as evidence of his propensity to murder Nailah. 725 ILCS 5/115-7.4 (West 2014).

Further uncharged conduct, of various kinds, was admitted as evidence of defendant's motive and/or Nailah's state of mind. Defendant argues that the jury instructions improperly allowed, and even "directed," the jury to consider *all* other-crimes evidence as propensity evidence.

¶ 172   Because the error is unpreserved, defendant alleges plain error by the trial court and, alternatively, ineffective assistance based on counsel's failure to object to the instruction.

¶ 173                                                              A

¶ 174   Subject to limited statutory exceptions (*id.* §§ 115-7.3, 115-7.4), other-crimes evidence is not admissible to prove that the defendant has a propensity or disposition to commit the charged offense(s). Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v. Pikes*, 2013 IL 115171, ¶ 13. The problem is not that other-crimes evidence has no probative value, but rather that it has "too much": It may tempt the jury to infer, all too easily, that since the defendant has committed *other* crimes, or bad acts more generally, he must have committed *this* crime, too. *People v. Clark*, 2015 IL App (1st) 131678, ¶ 27. But other-crimes evidence is admissible as proof of any material fact at issue other than propensity, as long as its potential for prejudice does not substantially outweigh its probative value. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v. Donoho*, 204 Ill. 2d 159, 170 (2003).

¶ 175   When the trial court admits other-crimes evidence for a non-propensity purpose, it should instruct the jury to consider the evidence *only* for that purpose. *People v. Brown*, 319 Ill. App. 3d 89, 99 (2001) (error to omit "only" from instruction listing allowable purposes of other-crimes evidence). The appropriate limiting instruction is set forth in Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000) (hereinafter IPI Criminal 4th), to be given, in the instructions at large, at the end of trial.

¶ 176   IPI Criminal 4th No. 3.14 may also be given orally, when the evidence is introduced. But

whether to give a contemporaneous instruction is a matter left to counsel's discretion; the defense may reasonably choose to go without one to avoid calling undue attention to other-crimes evidence. See *People v. Johnson*, 368 Ill. App. 3d 1146, 1160 (2006) (limiting instruction should not be given over defense objection (citing *People v. Denny*, 241 Ill. App. 3d 345, 360-61 (1993))); Ill. R. Evid. 105 (eff. Jan. 1, 2011) (instruction "shall" be given at defense counsel's request).

¶ 177    We review *de novo* whether the instructions, taken as a whole, properly convey the legal principles that the jury must apply. *People v. Parker*, 223 Ill. 2d 494, 501 (2006).

¶ 178    The trial court gave the jury one oral limiting instruction during trial, immediately before the "FBI" e-mail was introduced. Recall that the e-mail, sent by Nailah to Tiffani Miley and Dana McClellan, included a Chicago Sun-Times article detailing defendant's stint in federal custody. After he was arrested on drug and weapons charges and for threatening a Highland Park police officer who was investigating him for stealing cars, defendant escaped from custody at the Dirksen federal courthouse. While "on the lam," he called FBI agents to "taunt" them, boasting "You're not going to catch me." Two weeks later, the FBI found him and arrested him again.

¶ 179    The trial court admitted the e-mail as proof of the State's theory of motive: that defendant was furious at Nailah, among other reasons, for sharing details of his sordid past with others in their circle. (Defendant does not challenge the admission of the e-mail on this basis.) At defense counsel's request, the trial court instructed the jury that it was about to hear evidence "that the defendant has been involved in conduct other than that charged in the indictment. This evidence has been received strictly on the issue of the defendant's motive and may be considered only for that limited purpose."

¶ 180    No other limiting instructions were given during the presentation of evidence. At the end of the trial, the court began its instructions in the usual way, with IPI Criminal 4th No. 1.01, and included this relevant bracketed material: "Any evidence that was received for a limited purpose should not be considered by you for any other purpose."

¶ 181    The court then gave IPI Criminal 4th No. 3.14, modified as follows:

"Evidence has been received that the defendant has been involved in offenses other than that charged in the indictment. This evidence has been received on the issues of the defendant's *propensity*, motive, and state of mind and may be considered by you only for those limited purposes." (Emphasis added.)

¶ 182    As defendant notes, the instruction incorrectly implied that other-crimes evidence was admitted as proof of *his* state of mind but not Nailah's as well. But defendant does not seek relief on this basis, so we will leave this point aside.

¶ 183    Defendant focuses on the fact that the end-of-trial instruction allowed, or even "directed," the jury to consider *all* of the other-crimes evidence as propensity evidence. That is because the instruction did not "delineat[e]" for the jury which other-crimes evidence it could properly consider for each of the listed purposes. A properly tailored instruction, he says, would have laid this all bare: You may consider *this* for motive, *that* for state of mind, *such-and-such* for propensity.

¶ 184    There are real dangers to the defense in precisely "delineating" the permissible use(s) of each item of other-crimes evidence in a jury instruction. Like any other limiting instruction, but perhaps even more so, the instruction defendant proposes would risk drawing undue attention to damaging evidence. And unlike limiting instructions modeled on IPI Criminal 4th No. 3.14, it would recapitulate the State's arguments—say, its theory of motive—and put those arguments

into the judge's mouth. These are good reasons why the defense might not *want* this kind of instruction, no matter what issues it includes—and *especially* when one of those issues is propensity. See *Johnson*, 368 Ill. App. 3d at 1161 ("Counsel may have made a tactical decision not to request such an instruction to avoid unduly emphasizing the other-crimes evidence.").

¶ 185   But that's not to say that the instruction was fine as it stood. It included propensity as an issue that the jurors could consider but failed to confine the consideration of propensity to the specific evidence for which they could properly use this purpose. Not to worry, the State says, there is no danger in leaving the jurors to cast about other-crimes evidence on their own. Any "reasonably intelligent juror" will "easily" sort out which evidence is "relevant" to that issue.

¶ 186    In this vein, the State argues that IPI Criminal 4th No. 3.14 does not require the trial court to specify the precise conduct to which each issue listed in the instruction applies. We said as much in *People v. Lopez*, 371 Ill. App. 3d 920, 940 (2007), cited here by the State. But the instruction in *Lopez* listed only *non*-propensity purposes. *Id.* at 938 ("intent, motive, or absence of mistake").

¶ 187   And that difference is the whole ballgame. The great fear of other-crimes evidence—and thus the reason for IPI Criminal 4th No. 3.14—is that the jury may consider other-crimes evidence for a *propensity* inference. If the jury is permitted to consider other-crimes evidence in a certain case for, say, identity, and the jury instruction improperly includes other *non*-propensity reasons like motive or absence of mistake—it is error but often harmless error, as in *Lopez*, because the other *non*-propensity purposes are not the overriding concern here. Including propensity as one of the permissible purposes, however, is an entirely different story.

¶ 188   In a case like this, where some evidence (prior acts of domestic violence) could be considered for propensity purposes but various other types of other-crimes evidence could not,

the jury instructions had to delineate as much. When all the other-crimes evidence is lumped together in a single jury instruction and the jury is told that it may consider *any* of it for propensity purposes, why would lay jurors naturally limit the propensity inference to the domestic violence evidence but not the other other-crimes evidence? They wouldn't. There would be no logical or natural reason to do so. Other types of other-crimes evidence may just as easily tempt jurors to draw propensity inferences, as a consequence of their human biases, when it involves conduct other than domestic violence. See, *e.g.*, *Clark*, 2015 IL App (1st) 131678, ¶ 27 (collecting cases and reiterating that other-crimes evidence may " 'prove[ ] too much' " or overpersuade jurors). And jurors would have no way of knowing that domestic violence evidence has been given special evidentiary treatment via statute, based on specific public policy decisions made by our legislature. See 725 ILCS 5/115-7.3, 115-7.4 (West 2014).

¶ 189   Thus, if an instruction lists "propensity" as a question at issue but fails to confine the jurors to the specific other-crimes evidence that was admissible for this purpose, the unqualified reference to "propensity" may lead the jurors to draw improper propensity inferences along with the proper ones. How much of a risk it creates will depend, of course, on the specifics of the other-crimes evidence and the offenses charged in the indictment. (More on this later.)

¶ 190   What was the trial court—or defense counsel—to do? We can say this much with certainty: The reference to "the defendant's propensity" should not have been included in IPI Criminal 4th No. 3.14. It didn't belong there. It never does. The whole point of giving IPI Criminal 4th No. 3.14 is to *prevent* the jury from doing exactly that—considering evidence for the purposes of propensity—by listing the exclusive, *non*-propensity purpose(s) for which the jury may consider the other-crimes evidence. Allowing the jury to consider propensity under IPI Criminal 4th No. 3.14 defeats the whole point of the limiting instruction.

¶ 191   On the other hand, in a trial such as this one, when there is some other-crimes "propensity" evidence and some other-crimes evidence that cannot be considered for propensity evidence, the trial court must chart a middle path. We are aware of no solution, and have been cited none, in the Illinois Pattern Jury Instructions. But if the word "propensity" were omitted from IPI Criminal 4th No. 3.14, the State would be entitled to an instruction that *certain* evidence *could* be considered for propensity purposes. Maybe that takes the form of a separate instruction for the propensity evidence. Maybe it would require the trial court to heavily modify IPI Criminal 4th No. 3.14 to specifically lay out which evidence could and could not be considered for propensity purposes. (And of course, in a tactical decision, defense counsel may weigh the risks of highlighting that particularly damaging propensity evidence and request that the jury be instructed on *none* of this.)

¶ 192   What cannot happen, however, is what happened here: The jury was told that it could consider *all* of the other-crimes evidence for propensity purposes, when that was not the case.

¶ 193   Including "the defendant's propensity" in what was supposed to be a limiting instruction was a "substantial defect[ ]" warranting plain-error review. See Ill. S. Ct. R. 451(c) (eff. Apr. 8, 2013; R. 615(a); see *People v. Sargent*, 239 Ill. 2d 166, 189 (2010) (Rule 451(c) is "coextensive" with plain-error rule). For the same reasons, counsel had no valid strategic reason to let the reference to "propensity" stand. It was not required by the pattern instruction; it was basically the opposite of a limiting instruction; and it could only hurt defendant. Counsel's failure to object to the defective instruction, or to tender an adequate one, was deficient performance. See, *e.g.*, *People v. Getter*, 2015 IL App (1st) 121307, ¶ 73 (counsel deficient for acquiescing in defective jury instruction tendered by State).

¶ 194                                          B

¶ 195   Our next question is whether the error warrants reversal. Defendant argues for reversal under theories of first- and second-prong plain error and ineffective assistance of counsel. Under any analytical framework, the threshold question is whether the instruction created a serious risk that a reasonable juror, conscientiously striving to apply the court's instructions, would have drawn an improper propensity inference from any of the evidence on which defendant bases his claim. See, *e.g.*, *Sargent*, 239 Ill. 2d at 191 (inquiry is whether instructional error created serious risk that jurors convicted defendant because they did not understand applicable law).

¶ 196   If so, we then ask whether the risk of having the jury draw that inference was either a serious enough error to deny defendant a fair trial, regardless of the strength of the State's case, or a damaging enough error, given the strength of the evidence as a whole, to potentially swing the verdict against him. See *People v. Sebby*, 2017 IL 119445, ¶ 48 (standards for first- and second-prong plain error); *People v. White*, 2011 IL 109689, ¶ 133 (similar showing of prejudice needed for first-prong plain error and ineffective assistance).

¶ 197   Defendant lists several pieces of evidence that could have been improperly considered for propensity purposes. We start with the "FBI" e-mail, which listed several of defendant's previous criminal offenses.

¶ 198   Did the end-of-trial instruction create a serious risk that the jury would draw a propensity inference from the information about defendant's alleged criminal history conveyed in the "FBI" e-mail? The e-mail itself undoubtedly courted that risk. But limiting instructions are presumed to be effective. *People v. Boston*, 2018 IL App (1st) 140369, ¶ 75; *People v. Lenley*, 345 Ill. App. 3d 399, 411 (2003); see *People v. Wilmington*, 2013 IL 112938, ¶ 49 ("Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them."). And here, the trial court not only gave a contemporaneous instruction at defense

counsel's request, but also reinforced that instruction with IPI Criminal 4th No. 1.01.

¶ 199    To overcome the presumption that these limiting instructions served their purpose, defendant would have to establish that they were undercut, and thus rendered ineffective, by the reference to "the issue of the defendant's propensity" in the other end-of-trial instruction, IPI Criminal 4th No. 3.14. But he fails to develop any substantive argument along these lines. And we doubt that the argument would succeed, anyway.

¶ 200    Such an argument might have legs if the "FBI" e-mail was the *only* clear instance of other-crimes evidence offered at trial. Then there might be a perceived conflict between the contemporaneous limiting instruction regarding the "FBI" e-mail, plus the reinforcing instruction of IPI Criminal 4th No. 1.01, on the one hand, and IPI Criminal 4th No. 3.14, on the other.

¶ 201    But here, as defendant is keen to point out, other examples of his alleged prior offenses were also presented to the jury. And while the oral instruction for the "FBI" e-mail was limited to motive, the end-of-trial instruction listed not only motive but also propensity and state of mind. A reasonable and diligent juror could put two and two together: In addition to the "FBI" e-mail, the end-of-trial instruction *also* applied to the *other* evidence, and *that* evidence could be considered for certain purposes other than motive.

¶ 202    In short, the end-of-trial instruction did not conflict with the oral instruction for the "FBI" e-mail. The instructions were not difficult to reconcile, and the jury never expressed confusion or sought clarification from the court about any perceived conflict. So the usual presumption stands: The limiting instructions for the "FBI" e-mail were effective; they kept the jury from drawing an improper propensity inference from that evidence. So we fail to see how the end-of-trial instruction would have led the jury to improperly consider the offenses mentioned in the "FBI" e-mail.

¶ 203   Defendant cites other examples of defendant's uncharged "offenses," the most prominent of which was surely Nathaly's and Ina's testimony about his alleged domestic violence. The trial court admitted their testimony as evidence of defendant's propensity to commit acts of violence toward his intimate partners and, thus, in the end, as evidence of his propensity to murder Nailah. See 725 ILCS 5/115-7.4 (West 2014) (authorizing admission of such evidence for propensity purposes). That evidence was thus *properly* admitted for propensity purposes and cannot form the basis of an error here.

¶ 204   Defendant bases his claim of error, in part, on Nailah's responses to his "B***, I'm rich" e-mail and a contemporaneous e-mail to Ina. These e-mails revealed that in the days leading up to her murder, Nailah came to view defendant as a threat and sought an order of protection against him. Nailah's concerns were partly fueled by her recent discovery of defendant's alleged violence against Ina, to which she openly refers in the e-mails: "You are crazy, you hit women, you are a bully ***." In this context, Nailah proposed that they share information documenting the "danger" that defendant posed.

¶ 205   These e-mails were admitted as evidence of Nailah's state of mind. Defendant contends that the defective instruction also permitted the jury to draw a propensity inference from them. Even if we grant defendant that much, his argument goes nowhere. Because the propensity inference would have been based on the domestic violence evidence, it would have been proper, as just noted above. Thus, there is no risk that the instruction may have led the jury to draw an *improper* propensity inference from these e-mails. To this extent, the instructional error was harmless.

¶ 206   The "FBI" e-mail and domestic violence evidence were the most obvious and potentially damaging examples of other-crimes evidence offered at trial. But defendant argues that the jury

would have understood the end-of-trial instruction to allow it to draw propensity inferences from a host of other evidence admitted for non-propensity purposes.

¶ 207   For example, in early September 2007, after discovering that Nailah had been digging into his past, defendant allegedly left her an angry voicemail threatening to "erase" her or make her "disappear." (The message itself was not recovered, but Dana and Tiffani both testified that Nailah played it for them.) This apparent threat to kill Nailah was admitted as evidence of defendant's motive and of Nailah's state of mind. Defendant says that the jury would have treated it as propensity evidence, too, because the defective instruction allowed or even "directed" it to do so.

¶ 208   True, the jury instruction permitted the jury to consider this evidence for propensity, as well, but the overwhelming, obvious relevance of this testimony was not that defendant generally was a man of violent character who was thus more likely to have behaved violently in the future—the forbidden propensity inference. See Ill. R. Evid. 404(b) (eff. Jan. 1, 2011)). Rather, the clear relevance was that it showed defendant's motive to kill Nailah because she had been digging into his past, or if you prefer, his state of mind in wanting to commit violence against Nailah. Neither of those inferences are propensity inferences.

¶ 209   Some of the evidence defendant cites was not other-*crimes* evidence; it was, as he says, evidence of "bad conduct" in a broader sense. When a limiting instruction is meant to apply to other-*crimes* evidence, strictly speaking, it should refer to "*offenses* other than that charged in the indictment." See IPI Criminal 4th No. 3.14. The term "offenses" should be replaced with the broader term "conduct" when the evidence does not reveal a crime allegedly committed by the defendant but rather non-criminal behavior that, given the facts of the case, might still tempt the jury to draw a propensity inference. See IPI Criminal 4th No. 3.14, Committee Note.

¶ 210   Here, the end-of-trial instruction used the term "offenses," not "conduct." (The limiting instruction for the "FBI" e-mail used the broader term "conduct.") But defendant does not argue that the broader term should have been used, so we need not decide whether that was error by the trial court or deficient representation by counsel.

¶ 211   Thus, defendant's claim of instructional error can only be based on evidence that the jury likely would have understood to reveal an alleged "offense." We are mindful that lay jurors are not versed in criminal law, and that our determination of how the jury may have understood the instruction in this respect cannot fairly be based on technical legal analysis. The question, rather, is whether a reasonable person, exercising ordinary common sense, would likely view certain alleged conduct as criminal in nature.

¶ 212    It is hard to imagine that the jury viewed defendant's calls to Tiffani, cited in this context by defendant, as a criminal "offense." After his relationship with Nailah fell into a downward spiral, defendant repeatedly called Tiffani, who told him, in no uncertain terms, that she did not want to get in the middle of any "drama" between them. (And that defendant's advances on her would continue to go nowhere.) When Tiffani asked defendant to stop calling, he refused; when she blocked his number, he called from a different one.

¶ 213   Defendant's conduct was disrespectful toward Tiffani and perhaps, in Nailah's phrase, "obsessive" to boot. But not criminal. There is no reason why the jury would have thought that, per the court's instructions, it could consider defendant's unwelcome calls to Tiffani as evidence of his propensity to commit murder. And the instructional error aside, the jury was unlikely to draw such a strained and implausible inference, anyway. Whatever human biases they inevitably bring with them, reasonable jurors will not take every impertinence to reveal a violent and murderous character.

¶ 214   Similar points apply to the evidence that defendant stiffed Remi Ivanovas, a contractor he hired to renovate his condo, by refusing to make good on a bounced check. And to his "B***, I'm rich" e-mail—an arrogant, demeaning, and spiteful rant, sent in response to the "FBI" e-mail, in which defendant said that if Nailah kept "talking s*** and sending around articles" about him, he would retaliate by "passing around" a sex tape of them. (There was no evidence that he did.)

¶ 215   Defendant paints with too broad a brush when he complains that this evidence revealed "a very negative picture of [his] character." No doubt it cast him in an unfavorable light, but it did not reveal him as having committed other criminal "offenses," much less the kind of offenses that would reveal a general disposition to commit murder. As with defendant's calls to Tiffani, it is highly unlikely that the jury would have taken the court's instruction to sanction a propensity inference from any of this evidence, or that the jury would have drawn the inference, anyway.

¶ 216   That brings us to Nailah's "Adios" e-mail, in which she told defendant that his failure to disclose his "jail time and illegal history" was one reason, among many, why she was ending the relationship. The "Adios" e-mail was unique in that (i) it referred to defendant's alleged offenses *other than* domestic violence and (ii) no contemporaneous limiting instruction was given for it.

¶ 217   If defense counsel had requested a limiting instruction, that would be the end of the matter, as it was for the "FBI" e-mail. But counsel did not. And that was not unreasonable. By comparison, the "FBI" e-mail revealed concrete details about defendant's alleged criminal activities—enough for counsel to reasonably conclude that a limiting instruction was the only hope of fending off a damaging inference about defendant's violent criminal propensities. The "Adios" e-mail, in contrast, made only a minimal, unadorned reference to defendant's alleged criminal history—minimal enough for counsel to reasonably conclude that a limiting instruction

would risk drawing more attention to this reference than the jury may have given it on its own.

¶ 218   But having foregone a limiting instruction for the "Adios" e-mail, it was incumbent upon counsel to ensure that this other-crimes evidence, minimal as it was, did not get swept into an instruction that allowed the jury to draw a propensity inference from it. And it was incumbent upon the trial court not to give that erroneous instruction in the first place. The end-of-trial instruction did, on its face, permit the jury to draw an improper propensity inference from the "Adios" e-mail. In that respect, that e-mail is unlike any of the other evidence defendant has cited. If there was any prejudice or fundamental unfairness caused by the erroneous instruction, it is to be found here.

¶ 219   But we find little prejudice, if any. Nailah's isolated, minimal reference to defendant's alleged criminal past, and any inferences the jury might draw from that reference, were too thin and insubstantial on their own to deny defendant a fundamentally fair trial. And given the extensive, far-reaching evidence against defendant—set forth above and too voluminous to repeat here—it is hard to imagine that this reference loomed large in the jurors' minds. Whatever tack counsel might have taken—a corrected end-of-trial instruction, a contemporaneous limiting instruction, or even a successful bid to redact this reference from the "Adios" e-mail—we are confident that the verdict would have been the same. Defendant has not shown *Strickland* prejudice or plain error of either kind.

¶ 220   Defendant's principal citation, *People v. Johnson*, 2013 IL App (2d) 110535, does not convince us otherwise. In *Johnson*, counsel unreasonably agreed to a simultaneous jury trial on charges of domestic battery and unlawful possession of a weapon by a felon (UUWF) that were not subject to joinder. *Id.* ¶¶ 1, 45. On the domestic-battery charge, the trial court admitted the defendant's prior incidents of domestic violence toward the victim as propensity evidence. *Id.*

¶ 63. On the UUWF charge, the parties stipulated to the defendant's prior felony conviction. *Id.*

¶ 12. On each charge, the jury was thus presented with other-crimes evidence that never would

have been before it, if not for the improper joinder.

¶ 221   At the end of the trial, in a single rendition of IPI Criminal 4th No. 3.14 meant to cover

both charges, the court instructed the jury that it could consider evidence of the defendant's

uncharged conduct " 'on the issues of [his] intent, motive, design, knowledge, absence of

mistake, and propensity.' " *Johnson*, 2013 IL App (2d) 110535, ¶ 69.

¶ 222   The trial court's failure to give a "precisely tailored version" of IPI Criminal 4th No. 3.14

for each charge "compounded" or "amplified" the prejudice caused by the improper joinder of

the charges. *Johnson*, 2013 IL App (2d) 110535, ¶¶ 2, 67, 73. (The appellate court did not hold,

as we do today, that "propensity" does not belong in IPI Criminal 4th No. 3.14 at all.) A series of

erroneous propensity inferences were thus allowed: For example, on the UUWF charge, the jury

was allowed to consider the charged domestic battery, the prior domestic violence incidents, and

the threats that accompanied this conduct—which included, notably, a threat to start a "shootout"

should the victim call the police—as propensity evidence. *Id.* ¶¶ 20, 75. On the domestic battery

charge, the jury could consider the defendant's stipulated felony conviction (as well as other-

crimes evidence admitted on the domestic battery charge for non-propensity purposes). *Id.* ¶ 75.

¶ 223   This litany of "intertwined" errors in *Johnson*, and the series of propensity inferences it

allowed the jury to draw, denied the defendant a fair trial, regardless of the strength of the

evidence against him. *Id.* ¶¶ 2, 76. The instructional error here, on the other hand, did not come

close, in scope or in consequence, to the morass of mutually compounding errors that rendered

the trial in *Johnson* hopelessly defective and thus fundamentally unfair. The erroneous

instruction in this case, as we explained above, allowed one isolated inference, not a slew of

inferences; and it was a very weak inference at that, unlike at least some of the inferences that the jury was likely to draw in *Johnson*.

¶ 224   One final point. *Johnson* rejected the State's contention that the instructional error could not be reviewed at all, even as plain error, because the defendant had "invited" the error and was therefore estopped from raising it on appeal. *Id.* ¶¶ 77-81. Since the State tendered the defective instruction, defense counsel's failure to object—or "acquiescence," as the State says here—was a garden-variety forfeiture (and deficient performance), *not* an invitation to error. *Id.* ¶ 78. So too here. As in *Johnson*, we again reject the State's theory of invited error on these grounds.

¶ 225   For these reasons, we reject defendant's claim of instructional error as a basis for finding either plain error or ineffective assistance of counsel.

¶ 226                                      III

¶ 227   Defendant argues that counsel was ineffective for promising, in opening statement, that Tyrone Stevenson would testify in support of his alibi defense and then failing to call Tyrone during the defense case. And the prejudice to his defense was compounded, he says, when the prosecutor, during rebuttal argument, improperly commented on Tyrone's failure to testify and accused defense counsel of fabricating the entire alibi.

¶ 228                                       A

¶ 229   In the defense's opening statement, counsel sketched an account of defendant's plans that purported to explain his presence in Hammond on September 18. Defendant wanted to borrow Tyrone's van, so he could move some appliances out of the townhouse in Naperville. A friend dropped him off at Tyrone's house in Hammond. Defendant and Tyrone argued about a real estate deal that went bad, and Tyrone refused to loan him the van. Defendant asked Hugh and Castra Echols to come pick him up, which they did. Defendant told them he was stranded in

Hammond because he got into a fight with his uncle there.

¶ 230   As a threshold matter, the record shows that while counsel mentioned Tyrone in the course of sketching the alibi defense to come, counsel never explicitly promised that Tyrone would testify. Still, defendant says, counsel "created an expectation in the jurors' minds that they would hear from witnesses in support of [his] alibi, including, most importantly, Tyrone."

¶ 231   Although Tyrone did not testify, this "story of [defendant's] innocence," as he calls it, was told through the testimony of the other defense witnesses—Aaron and Mark Rush—and, to a lesser extent, Hugh and Castra Echols, who testified for the State. It is not true, as defendant says, that he could not convey his "innocent reason" for being in Hammond without Tyrone's testimony. Collectively, the witnesses conveyed that defendant had plans to move his appliances out of the townhouse (Mark), that Tyrone had vans at his house in Hammond (Aaron), that defendant was dropped off at Tyrone's house (Aaron), and that defendant got into an argument with Tyrone, leaving him stranded in Hammond (Hugh and Castra), just two or three blocks from where Nailah's car was found. All of this testimony, as woven together by defense counsel, apprised the jury of defendant's alleged innocent reason for going to Hammond, even without Tyrone's explicit testimony about the plan for defendant to borrow one of his vans or the dispute that caused this plan to fall apart.

¶ 232   Granted, having listened to the other witnesses, the jurors might have expected Tyrone to take the stand; he was, after all, one of the major characters in the story. And his testimony could have made one piece of the story more explicit. But that doesn't mean the alibi was not conveyed in its essentials, or that the jury did not understand, clearly enough, defendant's purported reason for being in Hammond. Indeed, the jury may well have found any further details provided by Tyrone, about his arrangement or his argument with defendant, to be largely beside the point.

¶ 233   Unlike in defendant's principal citations, counsel neither promised to call Tyrone as a witness nor failed to present evidence to support the theory sketched in opening statement. See *People v. Briones*, 352 Ill. App. 3d 913, 914-15 (2004) (counsel promised defendant would " 'get up here on this witness stand' "); *People v. Patterson*, 192 Ill. 2d 93, 121 (2000) (counsel promised but completely failed to present evidence that confession was coerced). And that all but scotches his claim that counsel was unreasonable, and thus deficient, for failing to call Tyrone to the stand. A broken promise is a strong basis for a finding of deficiency, as it seriously undermines the defense's credibility and invites the jury to infer that the undelivered evidence would have been adverse to the theory at issue. *Briones*, 352 Ill. App. 3d at 914-18. But here, there was no broken promise, and so the failure to call Tyrone is properly analyzed as an ordinary decision about whether to call a known alibi witness.

¶ 234   Defendant cannot prevail on such a claim. For one, because counsel did not renege on a promise, it was not, as defendant asserts, counsel's burden to make a record of the trial strategy that justified the decision not to produce the promised evidence. See *id.* at 918. Rather, it is defendant's burden to overcome the usual presumption that counsel's decisions about which alibi witness to call (or not) *were* based on strategic considerations. See, *e.g.*, *People v. Brown*, 371 Ill. App. 3d 972, 981 (2007); *People v. West*, 187 Ill. 2d 418, 432 (1999).

¶ 235   Defendant fails to carry this burden. And to be sure, the record discloses any number of ways in which Tyrone's credibility as an alibi witness would have been vulnerable to attack. He was a relative of defendant's, and a former law enforcement officer, who nonetheless failed for years to come forward with alleged exculpatory information in his relative's high-profile murder case. See *People v. Deloney*, 341 Ill. App. 3d 621, 635 (2003) (jury may give family, such as cousins, little weight as alibi witnesses); *People v. Singleton*, 367 Ill. App. 3d 182, 189 (2006)

(delay in coming forward is grounds for skepticism).

¶ 236   The State used Aaron's similar failure to come forward for many years—despite his own law enforcement background (in the military police) and close relationship with defendant—as the starting point of a withering cross-examination that left his credibility in serious doubt. And Tyrone could have fared even worse: He was not only a former law enforcement officer but a disgraced cop who was fired for shaking down drug dealers. Counsel could have reasonably concluded that Tyrone threatened to do more harm than good to the defense case.

¶ 237   Assuming, that is, that Tyrone was available and willing to testify in the first place. The record does not affirmatively establish that he was. And for all we know, he may not have been. A basic premise of the alibi defense, after all, was that defendant and Tyrone had a falling out.

¶ 238   Most importantly, defendant fails to show that his defense was prejudiced by Tyrone's absence. There are at least two reasons why. First, as far as we have been told, Tyrone would have testified that defendant came to his house to borrow a van, but they got into an argument about a real estate deal. For the reasons we have given, that testimony would not have added much to the alibi defense, the essentials of which were made clear to the jury by the other witnesses.

¶ 239   Second, it is very difficult to square the overall arc of the alibi story with the available objective evidence, namely the CSLI and surveillance footage. Defendant would have the jury believe that although he was seen walking out of Nailah's condo building with her around 1 p.m. on September 18, the last time she was confirmed to be alive, they went their separate ways at that time. Yet their phones *just happened* to spend the rest of the day pinging cell towers that traced a highly overlapping trajectory—culminating in both phones accessing the same towers and sectors, at nearly identical times, in the areas where Nailah's car, sample boxes, and body

were found. Supplementing the alibi defense with Tyrone's testimony, given its limited scope (as far as we have been told) and his myriad credibility problems, would not have changed anything. Tyrone's absence does not undermine our confidence in the jury's verdict.

¶ 240                                    B

¶ 241   Defendant also alleges that the prosecutor improperly commented on Tyrone's failure to testify and accused counsel of fabricating his alibi defense. He argues, on these grounds, that the prosecutor committed misconduct and that counsel was ineffective for failing to object. For ease of exposition, we take defendant's allegations in reverse order.

¶ 242   Accusing counsel of fabricating a defense is improper unless the accusation is based on competent evidence. *People v. Hudson*, 157 Ill. 2d 401, 442-43 (1993); *People v. Emerson*, 97 Ill. 2d 487, 497 (1983). There was no such evidence here. But neither was there such an accusation.

¶ 243   In rebuttal argument, the prosecutor repeatedly characterized Aaron's alibi testimony as a "fabrication" and asserted that he "was told what to say." By whom? The prosecutor never said. But "the insinuation was clear," defendant argues. It had to be defense counsel, since the "whole tenor" of the State's argument was that the alibi defense was fabricated, and "only the defense team would fabricate a defense."

¶ 244   To begin, the prosecutor's argument in rebuttal was a legitimate attack on the defense *theory*, not an improper attack on defense *counsel*. The crux of the argument was twofold: that Aaron's testimony did not square with the available objective evidence, namely, the CSLI and surveillance footage, and that this was not defendant's first purported alibi. He initially claimed to be at Target, with Hugh and Castra, and it was only after the police debunked this initial story (with the security footage of Hugh and Castra alone at Target) that he claimed to be with Aaron.

From all of this evidence, the State could fairly argue that Aaron's testimony, like defendant's original alibi story, was false, a fabrication.

¶ 245   As for *who*, if anyone, may have put these words into Allen's mouth, the prosecutor made no bones about it: It was *defendant*, not counsel. And it was *defendant*, not counsel, who spent much of September 18 trying to lay the foundation for a false alibi. Just as defendant allegedly fabricated the initial alibi story for Hugh and sent bogus messages from Nailah's phone until he could make himself seen in public—all of which happened years before trial counsel came into the picture—he later fabricated a new alibi for Aaron, after the initial story was unmasked. In this context, the prosecutor asked, rhetorically, "So what does *he* come up with?" The answer: "*He* comes up with a new and improved alibi starring *** Aaron Allen." Obviously enough, "he" refers to defendant.

¶ 246   There is no basis in the record for defendant's claim that the prosecutor either explicitly or implicitly accused counsel of fabricating the alibi. Rather, this case is like *Hudson*, 157 Ill. 2d 401. There, the prosecutor argued that the defense theory was " 'concocted,' " and the defendant claimed on appeal that this statement implicitly accused counsel of fabricating the defense. *Id.* at 442-43. The supreme court rejected this claim, noting that while the term " 'concoct,' " much like the term "fabricate[ ]" here, may suggest a disingenuous strategy conjured up for trial, it does not necessarily imply that counsel played any role in its creation. *Id.* at 443. To the contrary, the supreme court found that the prosecutor's statement in *Hudson* was a comment on the veracity of the defendant, not counsel. *Id.* So too here.

¶ 247   After arguing that the alibi defense was bogus, the prosecutor commented in rebuttal on Tyrone's failure to testify: "Where is the other half of this alibi team? Why didn't we hear from Uncle Tyrone Stevenson, his uncle? Why? Could it be because Uncle Tyrone wasn't willing to

come in here and lie under oath the way Aaron Allen was?"

¶ 248   Defendant contends that this remark was also improper. To begin, the prosecutor did not imply that counsel suborned perjury, as defendant appears to suggest; for the reasons we have given, the prosecutor fairly argued that Aaron's alibi testimony was untruthful, without casting aspersions on *counsel's* conduct.

¶ 249   And because Tyrone was a potential alibi witness identified by the defense at trial, the prosecutor was permitted to comment on his failure to testify as long as the commentary was not misleading, unfair, or unduly prejudicial. *People v. Kubat*, 94 Ill. 2d 437, 498 (1983); *People v. Brown*, 122 Ill. App. 3d 452, 460 (1984). In this vein, defendant objects to the rhetorical question at the end of the prosecutor's remark, which mentioned the possibility that Tyrone did not testify because he was unwilling to lie.

¶ 250   We have approved of a prosecutor's use of similar rhetorical questions about the absence of a known alibi witness before. See, *e.g.*, *Brown*, 122 Ill. App. 3d at 459 (" 'Now I don't know why [the witness] isn't here. Is he afraid to take the stand? Is he afraid to tell the truth? Will the truth hurt the defendant? I don't know.' "). Defendant is correct that there was no evidence as to why Tyrone did not testify. But as in *Brown*, we do not read the prosecutor's rhetorical question as falsely implying that the evidence established the actual reason for Tyrone's absence. Rather, the upshot of the remark was that the jury could take the defense's failure to call its own named (albeit not *promised*) witness as one more hit to the credibility of an alibi defense that was already hard to believe. And that much was fair argument. See *Kubat*, 94 Ill. 2d at 497.

¶ 251   And this rhetorical question about Tyrone was, if nothing else, inconsequential. The alibi, on its face, suggested at least one other possible reason why Tyrone did not testify: He had a falling out with defendant. The jury was free to reject any competing inference about Tyrone that

the prosecutor's rhetoric may have invited it to draw. Last but not least, the alibi defense was weak, for all of the reasons we have discussed. We find no misconduct or ineffective assistance.

¶ 252                                         IV

¶ 253   Defendant alleges numerous other instances of prosecutorial misconduct. Since none of them were met with an objection, and defendant does not claim that counsel was ineffective on any of these grounds, his burden is to show plain error.

¶ 254   The parties dispute the proper standard of review for claims of prosecutorial misconduct, and the case law gives mixed signals. But defendant's claims have little, if any, substance, and they would fail under any standard of review. So we can leave this dispute for another day.

¶ 255   First, defendant claims that the prosecutors "ridiculed" and "disparaged" defense counsel for cross-examining the medical examiner, Dr. Crowns, and challenging his determination that the cause of death was asphyxiation. In the same breath, he says, the prosecutor "denigrated" his constitutional right to the assistance of counsel by implying that only a guilty person would challenge the State's evidence.

¶ 256   In rebuttal argument, the prosecutor said, "This is how desperate they are. They go so far when they are cross-examining Dr. Crowns to attack his manner of death. What are they saying, she committed suicide ***?" After listing various other possibilities—none of which the defense ever suggested—the prosecutor asked, rhetorically, "Why does he care? If he didn't do it, why does he care how she died?" And then the prosecutor answered her own question: "Because he knows how devastating the testimony of Nathaly Figueroa *** was."

¶ 257   The prosecutor neither disparaged counsel nor denigrated defendant's right to counsel. These allegations ignore the prosecutor's own answer to the question, "Why does he care?" He cared because Dr. Crowns's finding that Nailah died by asphyxiation made the evidence that

defendant had a history not only of abusing women but of *choking* and *suffocating* them that much more damaging. The defense either had to explain away the suspicious resemblance between Nailah's death and defendant's abuse of Nathaly and Ina, or else mount a successful challenge to the medical examiner's finding. Counsel pursued the latter approach. That was the prosecutor's point.

¶ 258   To be sure, the State made this point, and many others its rebuttal argument, through a liberal use of rhetorical questions. But rhetorical questions are not inherently improper. And here, they were aimed at the defense's *arguments*, not at counsel personally or at defendant's right to conduct a defense with counsel's assistance.

¶ 259   Second, defendant says that the prosecutor similarly mocked counsel for cross-examining Agent Easter and challenging the CSLI evidence; and in so doing, the prosecutor again implied that only a guilty person would challenge the State's evidence.

¶ 260   The defense argued that the CSLI evidence, a cornerstone of the State's case, actually revealed an exculpatory fact: Defendant's phone was still in Chicago when Nailah's arrived in Calumet City, which showed that they were not together and hence that defendant could not have been the one who killed her. The defense pursued this point in cross-examination and highlighted it on an exhibit published to the jury. In rebuttal argument, the prosecutor responded:

> "Most of all, why does he care? If he didn't do it, if he had nothing to do with her death, why does he care? If she is alive or dead at 7:30 and 8:30 that night, why care about any of those communications they had on their big exhibit? If he didn't do it, why does he care?"

¶ 261   Defendant quotes the prosecutor's comment up to this point and lops off the answer to her own rhetorical question: "Because of the cell tower." Granted, the segue makes no obvious

sense; the prosecutor's favored rhetorical device fell flat in this particular instance. Be that as it may, she went on to argue, rightly or wrongly, that the defense misunderstood the CSLI: It listed "cell towers only" in its exhibit, ignored "which sectors are being used" and "the ranges being used on those sectors," and failed to account for the length of time an originating tower hangs on to a call. Agent Easter, in contrast, took all of these factors into account in his analysis, rendering it more trustworthy than the defense's own. All of this was fair argument, directed at the defense theory, not at counsel personally or at defendant's constitutional rights.

¶ 262  Defendant also complains, in this context, that the prosecutor's reference to the defense's "big exhibit" was improper mockery. The exhibit was, in fact, larger than others and so easily referenced in this way. Defendant's argument is frivolous and merits no further discussion.

¶ 263  Third, defendant argues that the prosecutor improperly "introduced" Dana's hearsay statement to Detective Przepiora during rebuttal argument, in defiance of the trial court's order barring that evidence.

¶ 264  To understand this claim, a fair amount of context is necessary. There was a dispute as to what Dana saw when she went to Nailah's condo on the day Nailah went missing. According to the report written by Detective Carter (who was called by the defense), Dana said that she went into the condo twice: The first time, it was orderly and Nailah's laptops were there; the second time, it was in disarray and Nailah's laptops were missing.

¶ 265  But Dana testified that she only went inside the condo once—she could not get in the first time she tried because she did not have the spare key with her—and when she did, it was in disarray and Nailah's laptops were missing. In response to this ostensible impeachment, the State sought to introduce Detective Przepiora's report, which was said to be consistent with Dana's testimony. Because Detective Przepiora did not testify, the State proposed to introduce the report

through the testimony of Detective Carter.

¶ 266    The trial court did not allow the State to elicit the content of Detective Przepiora's report or that it was different than Detective Carter's report. The court did allow the State to elicit that Detective Przepiora took four pages of notes when he interviewed Dana. And the court ruled that "this is a subject matter of argument." The prosecutor "can argue that [Dana] was telling the truth and that [Detective Carter] made a mistake because of the way he took the reports."

¶ 267    And that is exactly what the State argued in rebuttal, in the course of responding to the defense's argument that Detective Carter's report was accurate, and that Dana was either lying or mistaken. Specifically, the prosecutor argued that Detective Carter—who conducted the missing person's investigation but was then removed from the case because he was not a violent-crimes detective—was in over his head, did not take notes, wrote his report from memory, made other demonstrable errors in his report that were brought out on cross-examination, and acknowledged in his testimony that he might have gotten this wrong, too. In contrast, Detective Przepiora, a violent-crimes detective, interviewed Dana promptly and based his report on the notes he took. And if Dana "had told [Detective Przepiora] anything different than what she said on the witness stand, you would have heard about it."

¶ 268    In other words, the prosecutor argued that if Dana had made prior inconsistent statements to Detective Przepiora, the defense would have introduced those statements to impeach her—just as it sought to do with Detective Carter. We have held before that this line of argument is proper when, as in this case, it responds to the defense's argument that a State witness was not credible. See *People v. Wilson*, 257 Ill. App. 3d 670, 690-91 (1993); *People v. Thomas*, 121 Ill. App. 3d 883, 893 (1984). And in making this argument, the State hewed closely to the terms of the trial court's ruling. The prosecutor argued all of the points she was permitted to argue, but she never

revealed the content of Dana's (alleged prior consistent) statement.

¶ 269   Fourth, defendant argues that the State elicited from Dr. Crowns improper hearsay that the other pathologists at the Cook County Medical Examiner's Office reviewed and concurred with his cause-of-death determination.

¶ 270   On direct examination, and over the defense's hearsay objection, Dr. Crowns described the office's peer-review process. After conducting an autopsy, the examiner presents the findings for discussion by the office at large. If the other pathologists agree, the findings are accepted as final. If there is disagreement and "no resolution could be taken"—in other words, if a consensus is not reached—"it would go to a vote and the majority would rule the cause and manner of death." Dr. Crowns presented his findings from Nailah's autopsy at one such meeting, but he did not remember what happened at the meeting other than that "there was a majority opinion reached." The trial court sustained a defense objection and struck the words "majority opinion." Dr. Crowns thus testified that "[t]he opinion for the cause of death was asphyxia."

¶ 271   For starters, "eliciting hearsay" is generally not a basis for a finding of prosecutorial misconduct. Even less could the prosecutor commit misconduct when the trial court ruled on a defense objection and allowed the testimony that was elicited. And as a hearsay exception, an expert witness may testify about the findings and conclusions of a non-testifying expert that the witness used in forming his or her opinion. *People v. Williams*, 238 Ill. 2d 125, 143 (2010); *People v. Lovejoy*, 235 Ill. 2d 97, 143 (2009). Here, Dr. Crowns was clear that the peer-review process is a standard procedure for reaching a final determination as to the cause of death.

¶ 272   What's more, defendant's claim that Dr. Crowns's findings were "unfairly bolstered" by this evidence rests on a misreading of the record. Dr. Crowns never said that the pathologists reached a consensus about Nailah's cause of death. In fact, he said the opposite: A "majority"

opinion was reached, and a majority vote is only taken when there is *no* consensus. In other words, Dr. Crowns's testimony implied that at least some of the other pathologists disagreed with his findings. (Not a bad start to a reasonable doubt argument regarding the cause of death, an argument the defense did pursue. But instead, the defense objected to this testimony.) This was hardly the unfair bolstering that defendant makes it out to be.

¶ 273   Fifth, defendant claims that the State commented on evidence that was never introduced when discussing its theory of motive in closing argument. The State's theory was that defendant had a "problem": Nailah and Ina were sharing damaging information about his history of abusing women and his criminal history more generally. When his "anger *** reached its boiling point," he had to decide what to do. And he decided to kill Nailah. Why Nailah? As the State argued, he "can't get rid of Ina because who will take care of Ava. Reginald Potts can't be saddled down with a baby while he is choosing his sex partner of the day." So he "would have to keep Ina alive. Nailah, yes, she is the expendable one. In his mind, erase Nailah, erase the problem."

¶ 274   Defendant says there was no evidence that he ever contemplated killing Ina but decided against it to avoid being saddled with a baby, as the prosecutor suggested. As we understand the State's argument, the prosecutor was merely asking the jury to consider a *theory*, namely, that defendant had to choose between killing Nailah and Ina to rid himself of his ongoing "problem" and that he chose to kill Nailah because he viewed her as more expendable. Granted, this theory did ask the jury to *infer* that killing Ina presented itself to defendant as a possible solution to his problem. But that inference was not unreasonable. The evidence showed that defendant, in a fit of rage, locked Ina in a room, put baby Ava face down on the bed, and vigorously choked Ina with both hands until her mother came by and broke the glass on the door. Not to mention the times that defendant suffocated, choked, or otherwise beat Nathaly. A jury could reasonably infer

from this evidence—and so the State could reasonably argue—that defendant would go so far as to consider killing Ina, even if he ultimately decided to kill Nailah instead.

¶ 275   Sixth, defendant argues that the State "mischaracterized the CSLI evidence" in various ways. For one, he says, the prosecutor repeatedly prompted Agent Easter to place defendant's and Nailah's phones "together" or "in lockstep" at certain incriminating locations. Not so. The prosecutor specifically elicited from Agent Easter that CSLI does not "give an exact location of a cell phone." (Times have changed somewhat, as Chief Justice Roberts noted in *Carpenter*, 585 U.S. at ___, 138 S. Ct. at 2219). And countless times, the prosecutor asked, and Agent Easter answered, whether the CSLI was "consistent with" the two phones being in or "in the area of" a particular location at a particular time. Defendant's brief whitewashes all of these qualifying phrases from the record.

¶ 276   Defendant complains that the prosecutor's opening statement "overstate[d]" the CSLI evidence. At one point, the prosecutor said, defendant's phone was so close to the tower where Nailah's car was found that if the tower "had fallen down it would have hit him in the head."

¶ 277   Taken literally, this quip does overstate the CSLI evidence; by the State's own admission, as we just noted, the CSLI could not pinpoint the location of defendant's phone with that level of precision. But we are not so sure the prosecutor meant this quip to be taken literally; it certainly reads more like a stylized figure of speech. Prosecutors (and defense attorneys) should be cautious with such expressions, particularly during opening statements, lest they run the risk of misleading the jury about what the evidence is expected to show. See *People v. James*, 2017 IL App (1st) 143391, ¶ 67 (parties do not enjoy same " 'wide latitude' " in opening statements as in closing arguments). But the jury was instructed, as it always is, that an opening statement is not evidence. And the evidence itself, presented through the direct examination of Agent Easter,

made clear for the jury the level of precision that CSLI can achieve. The prosecutor's quip may have overshot the mark, but it was neither misconduct nor reversible error.

¶ 278   On a related note, defendant complains that the prosecutor described Agent Easter's job as "to catch criminals who are reckless with phones." It is simply not true, as defendant asserts, that this inappropriately branded *him* as a criminal or misdescribed Agent's Easter's job as an FBI agent and expert in historical cell-site analysis.

¶ 279   Seventh, defendant says that the prosecutor personally vouched for the credibility of two experts: Jessica Smith, the digital forensic examiner who examined the iPod found in defendant's condo, and Dr. Crowns.

¶ 280   A prosecutor may argue that a witness is or is not credible but may not personally vouch for the credibility of a witness or use the credibility of the state's attorney's office to bolster a witness's testimony. *People v. Williams*, 2015 IL App (1st) 122745, ¶ 12. Improper bolstering only occurs when the prosecutor explicitly offers a personal opinion about the witness. *People v. Deramus*, 2014 IL App (1st) 130995, ¶¶ 51-52.

¶ 281   The prosecutor said that Smith had "amazing credentials, the best" and "gets paid a lot of money to do what she does." And as a "forensic pathologist," Dr. Crowns had "performed thousands of autopsies." He had "no dog in this fight," "no bias against defendant." His "entire job is to determine cause and manner of death, and he knows that the decisions he makes about the dead can drastically affect the lives of the living. He doesn't take that responsibility lightly."

¶ 282   The prosecutor's point was that both witnesses were highly qualified and experienced experts whose opinions were for that reason reliable. In the case of Dr. Crowns, the prosecutor further emphasized that the medical examiner functions as a neutral, independent fact finder, whose assessment of the evidence should for that reason be considered unbiased. In neither

instance did the prosecutor personally vouch for the witness.

¶ 283   Eighth, defendant argues that the prosecutors engaged in "evidentiary excess," a species of "prosecutorial overkill," and therefore misconduct. In particular, the prosecutors published to the jury a number of needlessly gruesome photos depicting Nailah's decomposed and maggot-infested corpse. In this way, they sought to arouse the jurors' sympathy for Nailah and resentment toward defendant.

¶ 284   The defense objected to the publication of these photos. The trial court heard from the parties, overruled the objection, and permitted the State to publish the photos. It is frivolous to argue that the prosecutors committed misconduct by publishing exhibits that the judge expressly ruled they could publish.

¶ 285   Ninth, defendant says that the State shifted the burden of proof. While the State typically may not argue that the defendant failed to produce evidence, "it is generally permissible for the State to point out in closing argument that evidence is uncontradicted." *People v. Keene*, 169 Ill. 2d 1, 21 (1995).

¶ 286   While arguing that the CSLI debunked defendant's alibi, the prosecutor told the jury in rebuttal that "[t]he only evidence that you heard about the location of the Defendant's phone and victim's phone on September 18th came from Special Agent Easter. He is an expert in historical cellular analysis, and you have to base your verdict on the evidence you heard." In other words, the CSLI, and Agent Easter's analysis of it, was uncontradicted. The prosecutor did not shift the burden of proof onto the defense.

¶ 287   Lastly, defendant argues that the prosecutor used "sarcasm" and "inflammatory remarks" to "inflame the jurors' passions" against defendant and engender sympathy for Nailah. Normally, it is *evidence*, not *argument*, that is said to " 'inflame the passions of jurors' " and thus prejudice

the defendant. *People v. Burton*, 338 Ill. App. 3d 406, 418 (2003).

¶ 288   In any event, defendant says that the prosecutor "likened [him] to an animal" with this rhetoric: "There was the hunter and the hunted. The hunter, Reginald Potts, pursuing Nailah Franklin. The hunted, the game, was Nailah."

¶ 289   The prosecutor thus likened *Nailah*, "the hunted, the game" to an animal—or rather, to someone whom defendant treated like an animal. And that description of defendant was proper. See *People v. Armstrong*, 183 Ill. 2d 130, 145-46 (1998) (proper to describe defendant who beat victim with a cane as " 'treating her like she was a baby seal' ").

¶ 290   But *defendant*, the "hunter?" While both animals and humans hunt, competent speakers of English do not usually refer to animals as hunting *game*. With its obvious connection to *sport*, this is a distinctly human idiom. Defendant's interpretation is strained, unnatural, and unlikely to reflect the jury's reaction to the prosecutor's rhetoric. And even if the remark admits of some ambiguity, we " 'should not lightly infer' " that the prosecutor intended, or that the jury assigned, the most damaging possible interpretation. *People v. Phillips*, 127 Ill. 2d 499, 529 (1989).

¶ 291   Defendant complains that the prosecutor called him sarcastic names like "Mr. Bentley," "Mr. Two-Story Condo," "Mr. Highrise," "Mr. Popular Guy," and "Reginald Bullseye Potts." Countless cases have reiterated that the use of mild sarcasm or invective is not misconduct (*e.g.*, *People v. Banks*, 237 Ill. 2d 154, 183 (2010); *Burton*, 338 Ill. App. 3d at 418), that reviewing courts do not act as the "speech police" in reviewing closing arguments (*People v. Montgomery*, 373 Ill. App. 3d 1104, 1118-19 (2007)), and that unflattering "appellations" are not improper where they are supported by the evidence or a reasonable inference from the evidence (*People v. Vargas*, 409 Ill. App. 3d 790, 797 (2011)).

¶ 292   The prosecutor's sarcasm was supported by ample evidence. Defendant endlessly boasted

that he was "very, very wealthy," drove a Bentley, and lived a lavish, swinging lifestyle full of sexual exploits. The prosecutor coined sarcastic names to highlight defendant's braggadocio and used them to juxtapose both his lavish lifestyle and the domestic violence evidence against the image of a doting father that defendant also tried to paint at trial. As the prosecutor reminded the jury, "Mr. Bentley, Mr. Two-Story Condo, Mr. Highrise" not only choked but also demanded money from the mother of his infant child—who still lived at home with her parents. Viewed in its full context, the prosecutor's sarcasm was not improper.

¶ 293   As for "Reginald Bullseye Potts," this was a direct retort to a key defense argument, that from the very start of the investigation, the police had "tunnel vision with one target, Reginald Potts." The prosecutor acknowledged that defendant was indeed the target, and because "every single piece of evidence *** was a carefully sharpened dart [that] hit its target," perhaps he should be nicknamed "Reginald Bullseye Potts." Whatever else one might say of this extended metaphor, it was not misconduct.

¶ 294   Defendant claims that the prosecutor unfairly engendered sympathy for Nailah through its "technique of [verbally] bringing [her] back to life in the courtroom." By this he means that the prosecutor invited the jury to "speak for Nailah," to "be the voice of Nailah," and to tell defendant, on her behalf, that "the lies are over, the manipulations are over, the deceit is over, the games are over, you can no longer outrun the evidence in this case." A prosecutor may urge the jury to administer justice and may phrase the call for justice as an invocation from the victim. *People v. Jackson*, 399 Ill. App. 3d 314, 318 (2010). That is all the prosecutor did here, if in somewhat metaphorical language. Defendant has not shown that the prosecutors committed misconduct of any kind.

¶ 295        V

¶ 296   Two days after defendant was sentenced—and nearly nine years after Nailah's murder— an anonymous witness contacted defense counsel and asked to meet in a parking lot. There, the witness claimed to have information that tended to show defendant's innocence, by implicating someone else in Nailah's murder. (Briefly: This other man was with Nailah, on September 18, 2007, at the Outback Steakhouse near the forest preserve, close to where her jewelry was found; and the location of her jewelry, the defense had argued at trial, was "the scene of her death.")

¶ 297   The anonymous witness was willing to sign an affidavit or testify before the judge, and to reveal his identity to the parties and the trial court—as long as his identity was not disclosed, in the process, to the broader public. Describing himself as a senior citizen who was well-known in the African-American and Caucasian communities, the witness claimed to fear for his safety, and his family's safety, if he publicly came forward against this other individual—whom he described, for the time being, as a business associate.

¶ 298   While a motion to reconsider defendant's sentence was pending, defense counsel moved for a protective order, pursuant to Illinois Supreme Court Rule 415(d) (eff. Oct. 1, 1971), to shield the witness's identity from public disclosure. Counsel's stated intention, upon securing the protective order, was to file a motion for new trial based on newly discovered evidence. In practical terms, this meant that the witness's affidavit would have to be filed under seal and that the hearing on the motion for new trial would have to be closed to the public or, as counsel put it, held "in a chambers setting."

¶ 299   The trial court denied the motion for a protective order. For one, the judge was extremely skeptical of this supposed new evidence, given the timing and circumstances of its emergence. (That a cell-phone was found in a stack of defendant's papers at his sentencing hearing, five days before the man came forward, probably didn't help his cause, even if he claimed that he found

the phone in the courtroom and was just passing it along, as if for the lost and found.) But the judge's skepticism about the provenance of this witness was not the key point.

¶ 300    More importantly, the judge ruled that no testimony would be given in this case other than in open court, with the usual right of public access to the court's proceedings and records. As the judge emphasized, Nailah's murder and defendant's ensuing trial had received extensive media coverage. Now that defendant stood convicted and sentenced, after a years-long, high-profile proceeding that was open to the public, the judge was unwilling to change course, close the courtroom, and allow defendant to litigate a motion for new trial free from public scrutiny of the proceedings. Defendant argues on appeal that the trial court erred in so ruling.

¶ 301    One preliminary point. The parties are quick to agree, without argument or citation, that the trial court could not have heard the motion for new trial that counsel proposed to file, for the simple reason that defendant had already been sentenced. In the State's view, this means that defendant was improperly asking the trial court to initiate some "sort of quasi post-conviction" proceeding and close it to the public.  Defendant's appellate counsel, meanwhile, infers that trial counsel was ineffective for not filing a section 2-1401 petition for relief from judgment. 735 ILCS 5/2-1401 (West 2014).

¶ 302    Whatever implications the parties may draw, we have serious doubts about the validity of their shared premise. See *People v. Gilmore*, 356 Ill. App. 3d 1023, 1035-36 (2005) (trial court could consider untimely motion for new trial, filed while motion to reconsider sentence pending, because court had jurisdiction over case). As we explained in *Gilmore*, affording the trial court discretion to hear an untimely motion for new trial, as long as the court still has jurisdiction over the case generally, furthers the judiciary's interest in resolving claims as quickly, economically, and accurately as possible. See *id.* at 1036. When a claim is ripe for prompt resolution in post-

trial proceedings, a sensible rule of procedure will not require it to be put off until collateral review, as the parties suggest doing here. See *People v. Downing*, 2019 IL App (1st) 170329, ¶ 38.

¶ 303   But we need not explore these points in any more detail. Procedural doctrine aside, we agree with the trial court on the merits of the underlying issue—namely, that the court was not required to close its proceedings to the public—so we resolve defendant's claim on this basis. In so doing, we assume, for the sake of argument, that the trial court could properly hear the motion for new trial that counsel proposed to file. Indeed, without that assumption, defendant's claim would not merit any further discussion at all.

¶ 304   Trial counsel framed the issue as a request for a protective order under Rule 415(d). Appellate counsel correctly concedes that Rule 415 does not apply because it governs pretrial discovery and recasts the issue as a matter of applying the informant's privilege. That privilege does not apply, either.

¶ 305   A confidential informant is someone who "submits information concerning a criminal act *to a law enforcement agency*." (Emphasis added.) 735 ILCS 5/8-802.3(a) (West 2014). As far as the record shows, the anonymous defense witness was not an informant, within the meaning of the statute and the privilege it codifies.

¶ 306   Illinois Supreme Court Rule 412(j)(ii) (eff, Mar. 1, 2001), cited by defendant, provides that "[d]isclosure of an informant's identity shall not be required where his identity *is a prosecution secret* and a failure to disclose will not infringe the constitutional rights of the accused." (Emphasis added.) The Committee Comments further emphasize that this is a "privilege[ ] accorded to the State," in recognition of the "value of informants to effective law enforcement." Ill. S. Ct. R. 412(j), Committee Comments (eff. Mar. 1, 2001). In short, the

informant's privilege was not defendant's to assert.

¶ 307   What's more, Rule 412(j) governs disclosure of the informant's identity to the defense, as the rule's title—"Disclosure to Accused"—makes clear. But nothing like that is at issue here; as counsel explained, the witness was willing to reveal his identity to the parties and the court. (As indeed he would have to, in order to testify at a hearing on the proposed motion for new trial. See Ill. S. Ct. R. 412(j)(ii) (eff. Mar. 1, 2001).) What the witness refused to do was reveal his identity *to the public*. And Rule 412(j) does not speak to *that* issue at all.

¶ 308   The public has a first amendment right of access to criminal trial proceedings and the records of those proceedings. *People v. Zimmerman*, 2018 IL 122261, ¶ 26; *Globe Newspaper Co. v. Superior Court for the County of Norfolk*, 457 U.S. 596, 603-06 (1982) (right to attend trial); *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1, 10 (1986) (*Press-Enterprise II*) (transcripts of preliminary hearing). Among other justifications, a public right of access to criminal proceedings safeguards the integrity of the fact-finding process, fosters an appearance of fairness, and serves as a check on the judicial process. *Globe Newspaper Co.*, 457 U.S. at 606.

¶ 309   A defendant also has a personal right, guaranteed by the sixth amendment, to insist on a public trial (and at least some other critical stages of the proceedings, such as a suppression hearing). *Waller v. Georgia*, 467 U.S. 39, 44-47 (1984). But there is no right, under the sixth amendment, to insist on a "private" one. *Gannett Co. v. DePasquale*, 443 U.S. 368, 382 (1979); *People v. Gacy*, 103 Ill. 2d 1, 36 (1984).

¶ 310   That said, the public's right of access to criminal proceedings is qualified and may yield to overriding considerations, such as the defendant's right to a fair trial. *Zimmerman*, 2018 IL 122261, ¶ 29; *Press-Enterprise II*, 478 U.S. at 9. "Such circumstances will be rare, however, and

the balance of interests must be struck with special care." *Waller*, 467 U.S. at 45. The

" 'presumption of openness' " is overcome only when " 'closure is essential to preserve higher

values and is narrowly tailored to serve that interest.' " *Id.* (quoting *Press-Enterprise Co. v.*

*Superior Court of California*, 464 U.S. 501, 510 (1984) (*Press-Enterprise I*).

¶ 311   Applying this framework, we take defendant to claim that the presumption of openness

should have yielded to his right to present exculpatory evidence, a right that he could effectively

exercise only if the trial court agreed to shield the witness's identity from public disclosure. That

is because the witness feared retaliation if he publicly implicated his business associate in

Nailah's murder. (Though the judge was left wondering whom the witness claimed to fear, we

agree with defendant that the answer was clear: the witness's associate, whom he would

implicate.) Thus, the proceedings should have been closed, at least to the extent necessary to

protect the identity of the witness.

¶ 312   This generic allegation does not overcome the constitutional presumption of openness. In

calling it "generic," we do not mean to disparage the fear of retaliation that witnesses in criminal

trials may face. That fear is often very real and not at all misplaced. But as the prosecutor argued

below, it is also ubiquitous.

¶ 313   To take but one common example, gang members may fear retaliation if they testify

against members of a rival gang, and even more so if they testify against members of their own.

Yet day in and day out, gang members and other witnesses testify at criminal trials—and sign

affidavits for postconviction petitions—in the face of such fears. If those fears were enough to

justify partial closure of the proceedings (even without any evidence of a specific, credible threat

to a witness) then closure would not be "rare" at all; it would be routine, if not the norm. See

*Waller*, 467 U.S. at 45. On this basis alone, the trial court was not required to close its courtroom

and conduct post-trial proceedings outside of the public's view.

¶ 314 Nothing we have said here precludes defendant from pursuing his claim of innocence in a postconviction petition.

¶ 315                    CONCLUSION

¶ 316 For these reasons, the judgment of the circuit court is affirmed in all respects.

¶ 317 Affirmed.

**No. 1-16-1219**

| | |
|---|---|
| **Cite as:** | *People v. Potts*, 2021 IL App (1st) 161219 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 08-CR-06600; the Hon. Thomas V. Gainer Jr., Judge, presiding. |
| **Attorneys for Appellant:** | Jennifer L. Blagg, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Douglas P. Harvath, Assistant State's Attorneys, of counsel), for the People. |